**COALITION TO SAVE OUR CHILDREN (formerly Brenda Evans, et al.), Plaintiffs,**

**v.**

**Madeline BUCHANAN, et al., Defendants.**

**Civ. A. No. 1816–1822 MMS.**

United States District Court, D. Delaware.

July 2, 1990.

Irving Morris, and Kevin Gross, of Morris, Rosenthal, Monhait & Gross, P.A., Wilmington, Del. (William L. Taylor, Washington, D.C., and Leonard L. Williams, Wilmington, Del. of counsel), for plaintiffs.

Bertram S. Halberstadt, of Wier & Halberstadt, Wilmington, Del., for intervening Hispanic plaintiffs.

David H. Williams, and Barbara D. Crowell, of Morris, James, Hitchens & Williams, Wilmington, Del., for defendant Red Clay School Dist.

Mason E. Turner, Jr., of Prickett, Jones, Elliott, Kristol & Schnee, and Marcia Rees, Deputy Atty. Gen., Dept. of Justice, Wilmington, Del., for defendant State Bd. of Educ.

## OPINION

MURRAY M. SCHWARTZ, Senior District Judge.

This is the latest round in the lengthy litigation involving the desegregation of the public schools in Northern New Castle County. The history of this case has been rehearsed elsewhere, *see, e.g., Evans v. Buchanan*, 512 F.Supp. 839, 841 n. 1 (D.Del. 1981), and need not be recited again here. For the sake of completeness, however, a brief recounting is provided. This desegregation litigation traces its origins to 1956, when suit was filed as an outgrowth of the landmark decisions of the United States Supreme Court in *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) (*Brown I*) and 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955) (*Brown II*). The case was reactivated in 1971. In the mid–1970's, a three-judge court determined that the Wilmington schools, which had been *de jure* black schools prior to *Brown I*, continued to be racially identifiable and that Wilmington's dual school system had not been eliminated. *Evans v. Buchanan*, 379 F.Supp. 1218, 1223 (D.Del.1974). In a subsequent opinion, the three-judge court found inter-district *de jure* segregation involving the school districts in northern New Castle County. *Evans v. Buchanan*, 393 F.Supp. 428, 438 (D.Del.), *aff'd*, 423 U.S. 963, 96 S.Ct. 381, 46 L.Ed.2d 293 (1975). After three weeks of evidentiary hearings, the three-judge court rejected remedial plans proposed by the parties and ordered the schools in the segregated districts to be desegregated and reorganized. The responsibility for implementing the court's order was given to the State authorities. *Evans v. Buchanan*, 416 F.Supp. 328 (D.Del.1976), *aff'd*, 555 F.2d 373 (3d Cir.), *cert. denied*, 434 U.S. 880, 98 S.Ct. 235, 54 L.Ed.2d 160 (1977).

Upon the State's failure to submit a plan that would effectively eliminate the dual school system and the vestiges of *de jure* segregation, this Court entered an order consolidating the affected school districts into a single district ("1978 order"). The 1978 order addressed pupil assignment by requiring all students to attend schools in the former predominantly white districts for nine years and schools in the former predominantly black districts (the "City schools") for a minimum of three consecutive years (the "9–3 requirement"). Finally, the 1978 order required that a full 1–12 grade span be maintained within the City of Wilmington (the "City") and that at least one of the three former predominantly black high schools be used as a 10–12 grade center. *Evans v. Buchanan*, 447 F.Supp. 982 (D.Del.), *aff'd*, 582 F.2d 750 (3d Cir.1978), *cert. denied*, 446 U.S. 923, 100 S.Ct. 1862, 64 L.Ed.2d 278 (1980).

In 1981, after the Delaware General Assembly passed legislation empowering the Delaware State Board of Education ("State Board") to ensure compliance with the parameters set forth in the 1978 order, this Court approved division of the single consolidated district into four component school districts. Defendant Red Clay Consolidated School District ("Red Clay District" or "the District") is one of the four component districts. In May 1989, defendant State Board requested the Red Clay District to bring the racial composition of its student populations at each District school to within +/− 10% of the minority percentages for each grade level in the

District by Fall 1991. (PX 1–47)[1] After a series of delays, the Red Clay Consolidated School Board ("Red Clay Board" or "the Board") submitted to the State Board on or about March 30, 1990 a plan to achieve compliance with the State Board's request ("the Plan"). The Plan described a fully developed student reassignment component ("mixed feeder plan") and a choice component to be developed and submitted to the State Board by September 1, 1990. The Plan contemplated implementation of both components in September 1991. (PX 3)

The Coalition to Save Our Children (the "Coalition" or "plaintiffs"), representative of the black plaintiff class in this case, filed a motion seeking a court order directing:

(1) the Red Clay District: (a) to implement by September 1990 such changes in feeder patterns as will accomplish substantial compliance with the plus or minus 10 percent requirement, without counting the students in the Bilingual Program at the Alexis I. duPont High School as part of the Black minority which has created the problem of a small number of Black students at the Alexis I. duPont High School which presently has and will have as proposed far fewer Black students than any of the other three high schools in the Red Clay District; (b) to implement by September 1991 such further changes as will assure full compliance; and (c) to include as an element of its plan a "choice" program only if it is consistent with full compliance and operates fairly and equitably to offer meaningful options to all students;

(2) the State Board to take such steps to monitor the actions of the Red Clay District as to assure that the deadlines included in paragraph (1) are met;

(3) the State Board to assure that the Coalition is fully consulted and heard in all State Board proceedings on the Red Clay District, including all meetings and hearings conducted by the State Board. (Dkt. 1261) Essentially, the Coalition seeks implementation of the mixed feeder pattern portion of the Plan in September 1990. A bench trial was held before the court on June 12–15, 1990. The parties submitted post-trial memoranda, and oral argument was heard on June 25, 1990. This Opinion constitutes the court's findings of fact and conclusions of law with regard to plaintiffs' motion.[2]

At the outset, the court will address defendant Red Clay District's contention that the court lacks the power to order implementation of the mixed feeder plan even if it is satisfied that plaintiffs have made the requisite showing. In seeking an order directing the District to implement the mixed feeder plan in September 1990, the Coalition is in effect asking the court to modify its prior orders to require Red Clay to take additional remedial action to eliminate the vestiges of intentional discrimination still present in the District. The District argues this court is without power to order it to implement the mixed feeder plan for three reasons: (1) Red Clay is now and always has been in compliance with the court's 9–3 requirement and the other parameters of the court's remedial orders; (2) the alleged racial imbalances among certain Red Clay schools were not caused by intentional discriminatory acts by the District but rather result from demographic changes; and (3) an order requiring the District to implement the mixed feeder plan would be tantamount to an imposition of racial quotas in violation of the United States Supreme Court's decision in *Pasadena City Bd. of Educ. v. Spangler*, 427 U.S. 424, 96 S.Ct. 2697, 49 L.Ed.2d 599 (1976). Upon careful consideration of defendant Red Clay's arguments, the court concludes that it has the power to order Red Clay to implement the mixed feeder

---

1. Citation to the record is as follows:
   "PX __"—exhibit submitted by the Coalition to Save Our Children
   "SB __"—exhibit submitted by defendant Delaware State Board of Education
   "RC __"—exhibit submitted by defendant Red Clay Consolidated School District

Testimony of witnesses is indicated by the name of the witness in parentheses.

2. The parties' briefs and this Opinion are written without benefit of a trial transcript because of the necessity for an expedited decision.

plan to eliminate the vestiges of prior segregation. The District's arguments will be addressed in turn.

■ Because the three-judge panel found a violation of plaintiffs' constitutional rights, the court has broad powers to fashion a remedy. *Swann v. Charlotte–Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15, 91 S.Ct. 1267, 1275, 28 L.Ed.2d 554 (1971) ("Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies."). When the court issued its remedial order in 1978, it retained jurisdiction over the litigation until transition to a unitary system is complete. *Evans v. Buchanan*, 447 F.Supp. at 1039. Since no finding of a unitary system has ever been made, the court retains its supervisory jurisdiction over the case and over its 1978 and 1981 remedial orders.

■ Remedial decrees in a school desegregation case, like other injunctions, may be modified if the party entitled to relief "demonstrates that the decree has not been effective in achieving the relief to which the plaintiff was entitled." *Evans v. Buchanan*, 512 F.Supp. 839, 849 (D.Del.1981) (citing *United States v. United Shoe Corp.*, 391 U.S. 244, 251, 88 S.Ct. 1496, 1501, 20 L.Ed.2d 562 (1968)). The fact that the District has complied with the parameters of the 1978 order does not render the court powerless to order further remedial action. "Having once found a violation, the district judge [and] school authorities should make every effort to achieve the greatest possible degree of actual desegregation, taking into account the practicalities of the situation." *Davis v. Board of School Commissioners*, 402 U.S. 33, 37, 91 S.Ct. 1289, 1292, 28 L.Ed.2d 577 (1971). This affirmative duty is not limited to the implementation of a racially neutral assignment plan. *E.g., Morgan v. Nucci*, 831 F.2d 313, 321 (1st Cir.1987) ("Courts have recognized that the mere adoption of a racially neutral remedial plan is not tantamount to desegregation."). As the court found in *United States v. Lawrence County School Dist.*, 799 F.2d 1031, 1043 (5th Cir.1986):

> While judicial remedies for unconstitutional action must be targeted to elimination of the unconstitutional chancre, the remedial power of a federal court that adopts a desegregation plan is not thereafter limited to enforcement of the details of the original plan. Because ... a school system is not "automatically desegregated when a constitutionally acceptable plan is adopted and implemented, for the remnants of discrimination are not readily eradicated," the adoption of the plan does not exhaust the power of the court to direct elimination of vestiges of segregation that remain or become apparent only after the plan has been put into place.

(footnotes omitted); *see also id.* at 1044–45 ("[A] federal court's power to remedy segregation is not exhausted by its issuance of a decree that promises to, but does not, work.").

Stated differently, the remedial decrees entered by this court in 1978 and 1981 are not goals in and of themselves; rather, they are merely means to an end. The "end" to be achieved in this litigation is a unitary school system from which the vestiges of prior official segregation have been completely eradicated "root and branch." *Green v. County School Bd.*, 391 U.S. 430, 437–38, 88 S.Ct. 1689, 1693–94, 20 L.Ed.2d 716 (1968). In other words, plaintiffs are entitled to "maximum practicable desegregation," *Morgan v. Nucci*, 831 F.2d 313, 322 (1st Cir.1987), or the "greatest degree of desegregation possible under the circumstances." *Davis v. East Baton Rouge Parish School Bd.*, 721 F.2d 1425, 1435 (5th Cir.1983). A unitary school system, and not merely a remedial order, is the relief to which the plaintiffs in this litigation are entitled. Implementation of the court's orders alone do not relieve the Board of all future responsibility for achieving a unitary system. *Vaughns v. Board of Educ. of Prince George's County*, 758 F.2d 983, 989 (4th Cir.1985).

■ The remedial decrees seek to create and maintain a condition—complete eradi-

cation of the vestiges of official segregation. Compliance alone cannot be the basis for preventing the court from acting if it turns out that the remedial decrees do not achieve their goal. If the court finds that its remedial decrees no longer suffice as adequate means for achieving a unitary school system, the court has the power to modify the remedial decrees so as to better bring about that relief to which plaintiffs are entitled. *See generally Dowell v. Board of Educ. of Oklahoma City Public Schools,* 890 F.2d 1483, 1490–91 (10th Cir. 1989), *cert. granted,* —— U.S. ——, 110 S.Ct. 1521, 108 L.Ed.2d 761 (1990).

█ Of course, the court's power to order additional remedial action is not perpetual. Once there has been a finding that the school system has achieved unitary status, the court's power to order further action is at an end absent a showing of additional intentional discriminatory acts on the part of school officials. *See, e.g., Swann v. Charlotte–Mecklenburg Bd. of Educ.,* 402 U.S. 1, 31–32, 91 S.Ct. 1267, 1283–84, 28 L.Ed.2d 554 (1971); *Morgan v. Nucci,* 831 F.2d 313, 318 (1st Cir.1987) (citing *Dayton Bd. of Educ. v. Brinkman,* 433 U.S. 406, 410, 97 S.Ct. 2766, 2770, 53 L.Ed.2d 851 (1977)) ("[W]hen a court finds that discrimination has been eliminated 'root and branch' from school operations, it must abdicate its supervisory role...."). Further, it may be that if some aspect of a remedy order is found unitary, the court lacks authority to order additional remedial action with regard to that aspect. *Morgan v. Nucci,* 831 F.2d 313, 319–26 (1st Cir.1987) (Court of Appeals vacated district court's student reassignment order and remanded for a determination of whether the school district was unitary with regard to student assignments); *accord United States v. Overton,* 834 F.2d 1171, 1177 (5th Cir. 1987); *but see Pitts v. Freeman,* 887 F.2d 1438, 1446 (11th Cir.1989), *petition for cert. filed,* 58 U.S.L.W. 3536 (U.S. February 12, 1990) (No. 89–1290) (rejecting *Morgan's* ruling that unitary status may be achieved incrementally).

█ There has been no finding that the vestiges of prior official segregation have been eradicated "root and branch" from either the Red Clay District as a whole or from its student assignment patterns. To the contrary, the evidence adduced at trial indicates that the District has not achieved the greatest degree of desegregation under the circumstances with regard to its student assignments. *See infra.* This proceeding arose in part due to the State Board's determination that it would not seek on Red Clay's behalf a declaration of unitary status from this court. (SB 7, Letter from Charles E. Welch, then-President, State Board of Education to Donald F. Schneck, then-President, Red Clay Board (September 16, 1988), indicating that the State Board was not comfortable proceeding with an application for a declaration of unitary status on behalf of Red Clay and noting the racial disparities between Alexis I. duPont and Wilmington High Schools and their feeder patterns). Further, Susan Mathe, a member of the Red Clay Board from 1981 to the present testified that there had been racial disparity between the student populations of Alexis I. duPont ("A.I. duPont") and Wilmington High Schools in each year that she served on the Board. (Mathe) The district court should not abdicate its jurisdiction until the Board achieves unitary status. *Pitts v. Freeman,* 887 F.2d 1438, 1445 (11th Cir.1989), *petition for cert. filed,* 58 U.S.L.W. 3536 (U.S. February 12, 1990) (No. 89–1290). Since the Red Clay District has not been declared unitary, the court retains its supervisory power and may order further remedial action if necessary.

If the court were to order further remedial action in response to a showing that its current orders were not achieving unitary status, it would not be exercising its supervisory power in the manner prohibited by the Supreme Court in *Pasadena City Bd. of Educ. v. Spangler,* 427 U.S. 424, 96 S.Ct. 2697, 49 L.Ed.2d 599 (1976). In that case, the Court held that a district court could not order *annual* readjustment of attendance zones so as to comply with an inflexible requirement that no school contain a majority of any minority. *Id.* at 434–35, 96 S.Ct. at 2703–04. The Court was very careful to say what the case was not. It was

not a situation in which the district court ordered a "plan embodying specific revisions of attendance zones for particular schools, as well as provisions for later appraisal of whether such discrete individual modifications had achieved [a] 'unitary system'...." *Id.* at 435, 96 S.Ct. at 2704. *See Vaughns v. Board of Educ. of Prince George's County*, 758 F.2d 983, 989 (4th Cir.1985) ("From the inception of the ... [remedial] order, the parties understood and accepted that the plan was subject to modification and monitoring.... [T]his case is of the sort excepted by *Pasadena*...."). As part of its remedial orders, the court ordered monitoring of the racial composition of the schools affected by its orders. *E.g.,* PX 7. This case is exactly the kind of case excepted by the Court in *Pasadena.*

The Red Clay District also argues that the court is without power to order implementation of the mixed feeder plan because the racial imbalances between A.I. duPont High School and Wilmington High School and their feeder patterns alleged by plaintiffs are the result of demographic changes and were not caused by any intentional discriminatory acts on the part of the Red Clay authorities. Essentially, the District argues that the court cannot remedy the alleged disparities because they are not vestiges—the "roots and branches"—of the prior segregation. The effects of intentional segregation run deep, however, and the prior systemwide segregation found to exist by the three-judge panel furnishes prima facie proof that current disparities were caused at least in part by prior intentionally segregative official acts. *Dayton Bd. of Educ. v. Brinkman*, 443 U.S. 526, 537, 99 S.Ct. 2971, 2979, 61 L.Ed.2d 720 (1979). It is not plaintiffs' burden to prove that present racial disparities are causally related to pre–1978 segregation. Because the school system has not yet achieved unitary status, plaintiffs are entitled to a presumption that current disparities are the result of prior segregation, and the Red Clay District has the burden of proving otherwise. *Vaughns v. Board of Educ. of Prince George's County*, 758 F.2d 983, 991 (4th Cir.1985) (citing *Dayton Bd. of Educ. v.*

*Brinkman*, 443 U.S. 526, 537, 99 S.Ct. 2971, 2979, 61 L.Ed.2d 720 (1979) and *United States v. Gadsden County School Dist.*, 572 F.2d 1049, 1050 (5th Cir.1978)). *Accord United States v. Lawrence County School Dist.*, 799 F.2d 1031, 1043–44 (5th Cir.1986) (finding that demographic factors which separated residential areas by race were in part a vestige of past official segregative acts); *Davis v. East Baton Rouge Parish School Bd.*, 721 F.2d 1425, 1435 (5th Cir. 1983) ("Until it has achieved the greatest degree of desegregation possible under the circumstances, the Board bears the continuing duty to do all in its power to eradicate the vestiges of the dual system. That duty includes the responsibility to adjust for demographic patterns and changes that predate the advent of a unitary system."). So long as the Board continues to have an affirmative duty to eliminate the vestiges of prior intentional segregation, it must do more than merely abandon its prior discriminatory purpose. *Dayton Bd. of Educ. v. Brinkman*, 443 U.S. 526, 538, 99 S.Ct. 2971, 2979, 61 L.Ed.2d 720 (1979).

Finally, the Red Clay District argues that the court cannot order it to implement the mixed feeder plan because to do so would be tantamount to federal court imposition of racial quotas contrary to the Supreme Court's decision in *Pasadena City Bd. of Educ. v. Spangler*, 427 U.S. 424, 96 S.Ct. 2697, 49 L.Ed.2d 599 (1976). In *Pasadena*, the Court held that a district court could not require annual readjustments in student assignments to adhere to a rigid court-imposed requirement that no school contain "a majority of any minority." *Id.* at 433–35, 96 S.Ct. at 2703–04. The motion before the court is not a situation in which the court is being asked to implement a remedial plan of its own making. Rather, the court is being asked to implement a plan devised and adopted by the Red Clay Board itself. As previously stated, the Plan was developed in response to the State Board's request that the District bring the racial composition of its schools to within +/− 10% of the racial composition of the District as a whole at each grade level. The District of its own accord

also adopted the $+/-$ 10% guideline. (PX 1–47) Although the court may not impose its own specific numerical racial composition upon a school system, *see Milliken v. Bradley*, 418 U.S. 717, 740–41, 94 S.Ct. 3112, 3125–26, 41 L.Ed.2d 1069 (1974) (Constitution does not require a specific numerical racial balance), state and local education officials may adopt guidelines which seek to achieve a specific racial balance in the schools:

> School authorities are traditionally charged with broad power to formulate and implement educational policy and might well conclude, for example, that in order to prepare students to live in a pluralistic society each school should have a prescribed ratio of Negro to white students reflecting the proportion for the district as a whole. To do this as an educational policy is within the broad discretionary powers of school authorities....

*Swann v. Charlotte–Mecklenburg Bd. of Educ.*, 402 U.S. 1, 16, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 (1971).

■ Ordering the District to implement a Plan *that it has already adopted and which it proposes to implement eventually* is not tantamount to court-imposed quotas. First, the $+/-$ 10% guideline is not a creature of the court. Rather, it was adopted by the State and District officials themselves. Thus, the court would not be *imposing* the $+/-$ 10% guideline upon the District; the Red Clay District has already imposed that target on itself. Second, upon a showing that compliance with the current remedial orders alone fails to achieve a unitary system and that student reassignments are necessary, the court could order implementation of a plan that was not designed to conform to any particular numerical racial balance. The fact that the particular plan *already adopted* by the District itself happens to conform to a self-imposed numerical guideline should not affect the court's ability to order implementation of the plan if plaintiffs make an adequate showing that such plan should be implemented.

■ In summary, the court has the power to order the Red Clay District to implement the mixed feeder plan if it is shown that Red Clay's compliance with the parameters of the court's remedial orders has been insufficient to eradicate the vestiges of prior intentional segregative acts from the student assignment patterns in that District. The remainder of this Opinion is devoted to the question of whether there has been a showing sufficient to persuade the court to order implementation of the mixed feeder plan.

■ As has been stated, the Coalition must show that Red Clay's compliance with the 9–3 requirement and the other parameters of the remedial orders has not been effective in achieving the relief to which plaintiffs are entitled. That is, it must be shown that the District will not achieve maximum practicable desegregation without additional remedial action. Plaintiffs must also show that implementation of the Plan in 1990, as opposed to 1991, would significantly advance movement toward unitary status. In light of the special nature of a school desegregation case, plaintiffs' showing must be balanced against two countervailing considerations. The first consideration is that the job of administering the public schools is properly the province of state and local educators and not the federal courts. *See Evans v. Buchanan*, 447 F.Supp. at 1020 ("The Court regards the daily business of running the schools, even during desegregation, as peculiarly the function of State and local officials."). The "local autonomy of school districts is a vital national tradition." *Dayton Bd. of Educ. v. Brinkman*, 433 U.S. 406, 410, 97 S.Ct. 2766, 2770, 53 L.Ed.2d 851 (1977). Like the court, school authorities are "clearly charged with the affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch." *Green v. County School Bd.*, 391 U.S. 430, 437–38, 88 S.Ct. 1689, 1694, 20 L.Ed.2d 716 (1968). It is only when school authorities fail in their affirmative obligations that judicial authority may be invoked. This has been a theme

throughout the remedial stages of this litigation:

> It is axiomatic that state and local authorities are responsible for running public school systems. This Court decreed a single district school system *only after* state authorities *abdicated their responsibility* to come forward with a plan of reorganization compatible with the mandate to eliminate the dual school system and the vestige effects of *de jure* segregation.

*Evans v. Buchanan,* 512 F.Supp. at 850 (footnote omitted) (emphasis added).

The second consideration takes into account the practicalities of implementing the mixed feeder pattern in 1990 as opposed to 1991. Eradicating the vestiges of prior official segregation from the schools involves considering "not only what is fair but also what is practical." *Evans v. Buchanan,* 447 F.Supp. at 999. The Third Circuit Court of Appeals has emphasized in this case that "[h]aving once found a violation, the district judge or school authorities should make every effort to achieve the greatest possible degree of actual desegregation, *taking into account the practicalities of the situation.*" *Evans v. Buchanan,* 555 F.2d 373, 379 (3d Cir.1977) (quoting *Davis v. Board of School Commissioners,* 402 U.S. 33, 37, 91 S.Ct. 1289, 1292, 28 L.Ed.2d 577 (1971)) (emphasis added). The court will continue to follow the standard it set in 1978 that "the means employed to accomplish desegregation must necessarily be considered against the practicalities and equities of the situation in order to insure that a desegregation scheme is just in application and possesses a reasonable probability of success." *Evans v. Buchanan,* 447 F.Supp. at 1000. With these principles in mind, the court turns to the evidence presented by the parties.

Plaintiffs have shown that Red Clay's compliance with the 9–3 requirement and other parameters of the prior orders has not been effective in advancing the District toward maximum practicable desegrega-

tion. This finding is supported by the evidence of racial disparity between the student populations at the A.I. duPont and Wilmington High Schools.[3] As of September 1989, the District had a total minority enrollment (American Indian, Black, Asian and Hispanic) of 37.49% and a white enrollment of 62.51%. The District's total Hispanic enrollment was 7.38%. Its total black enrollment was 27.64%. At the same time, Wilmington High School had a total minority enrollment of 55.61% and a total white enrollment of 44.39%. Wilmington High School's black enrollment was 46.52%. Its Hispanic enrollment was 8.33%. By contrast, A.I. duPont's total minority enrollment was 24.14% and its white enrollment was 75.86%. Its black enrollment was 11.88%. A.I. duPont's Hispanic enrollment was 7.45%. (PX 17, Racial and Ethnic Report by School Pupil Enrollment (September 1989)). This disparity is also demonstrated by the composition of the two schools by classroom. As of November 1989, of the 412 classes conducted at A.I. duPont High School, 158 (38%) had fewer than 10% black students, while 7 (2%) had greater than 49% black students. By contrast, of the 290 classes conducted at Wilmington High School, only 3 (1%) had fewer than 10% black students, while 85 (29%) had more than 49% black students. (PX 7, Delaware Department of Public Instruction, Summary, Student Racial Composition by Grade by Classroom (November 16, 1989)). The racial composition of the two schools as compared to that of the District as a whole and the disparities between the populations of the two high schools show that the greatest amount of desegregation practicable under the circumstances has not been achieved in the Red Clay District's student assignments.

Evidence that the Red Clay District will not achieve maximum practicable desegregation without further remedial action may also be found in the statements of Dr. Joseph E. Johnson, Superintendent of the Red Clay District in a memorandum from Dr. Johnson to the Red Clay Board dated

---

**3.** Although the mixed feeder plan affects all grade levels and most of the schools in the District, the parties have focused primarily on the A.I. duPont and Wilmington High Schools. The court will do likewise.

March 19, 1984. (PX 35) In that memorandum, Dr. Johnson voiced his concern that racial disparities in the District be addressed. (PX 35) Additionally, the State Board indicated it did not feel that Red Clay had achieved maximum practicable desegregation when it declined to proceed with a petition for a declaration of unitary status on Red Clay's behalf and requested that the District take action to bring the racial composition of its schools more closely into balance. (SB 7; PX 1–47) In summary, the court finds plaintiffs have shown that Red Clay's compliance with the court's orders, without further remedial action, is not achieving the goal of maximum practicable desegregation. This finding weighs in favor of ordering implementation of the mixed feeder plan in 1990.

As stated above, this finding must be balanced against the practicalities of ordering the mixed feeder plan implemented in 1990. The District concedes that it would be possible for it to implement the mixed feeder plan in 1990 if ordered to do so by the court. The court must consider, however, whether an almost immediate implementation which is physically possible would also be practical and effective. Plaintiffs' own expert witness testified that there were great difficulties inherent in implementing the plan at the elementary level in 1990 and recommended implementation in 1991. (Foster) He also noted that substantial difficulties would be encountered in a 1990 implementation at the middle school level due to overcrowding and changes in grade structures. He stated, however, that implementation at the middle school level was "do-able" and recommended certain "make-shift" measures, such as retaining rising fifth graders at their sending elementary schools for one year and generally placing students for one year at certain schools so as to achieve a mathematical fit. Dr. Foster testified that the mixed feeder plan could be implemented in 1990 without great difficulty only at the high school level.

Dr. Johnson, the Superintendent of the District, questioned the success and long-term effectiveness of a September 1990 implementation. He noted the makeshift arrangements suggested by Dr. Foster would cause confusion and bring upon the District the wrath of its staff and community. He testified that implementation of the mixed feeder plan would require time to obtain from the court approval for deviations from the remedial orders necessitated by implementation immediately. Thereafter, within approximately two months' time, the District would have to accomplish a host of administrative tasks. Among those tasks are the transfer of teachers, rearrangement of transportation routes, and rescheduling of classes to accommodate changed grade structures and movement of students, all of which would be a heavy burden on the District's administrative staff. The District has not allocated the funds necessary to accomplish all of this by September 1990. Further, he testified that implementation in 1990 would probably involve a greater monetary cost than 1991 because it would necessitate calling staff back from vacation and incurring of significant overtime costs. In addition, he noted that his resignation resulting in a mid-summer change of school superintendents, vacancies at three important administrative positions in the District, and restructuring necessitated by the District's loss in a recent referendum would complicate implementation in 1990. Dr. Johnson also discussed the divisive effect development of the Plan had on the Red Clay community and the need for time to build community support for the Plan. He emphasized that the cumulative effect of the above would render immediate implementation of the Plan impractical and ineffective. (Johnson)

Alfred DiEmedio, the principal of A.I. duPont High School, also testified as to the effects of court-ordered implementation in 1990. He stated that the sudden movement of students would affect the ability of the schools to offer certain courses, most notably the availability of electives. This would occur due to changing enrollment and the fact that the schools would gain or lose staff depending upon student movement. He noted a potential "matching" problem—the specialties of transferred

staff would not necessarily dovetail with the receiving schools' needs. He stated that the movement of staff and students would necessitate rescheduling the schools which have already scheduled classes for the 1990 school year and voiced concern over the availability of staff and funds to perform this task in time. Finally, Mr. DiEmedio discussed the intangible ramifications of 1990 implementation. He noted that the large movement of students and staff would radically change the atmosphere at the schools, whose staff and students were psychologically unprepared for it. He testified there would be significant frustration on the part of both transferred and remaining students. He also stressed the importance of commitment to the reassignment on the part of staff, students and parents in order to make the assignment effective and prevent students from leaving the District. (DiEmedio, PX 37)

Plaintiffs counter this testimony by noting that it involves mere administrative difficulties. Plaintiffs have repeatedly asserted there is no testimony that 1990 implementation would work an educational harm. They also elicited testimony that certain schools would benefit from immediate implementation. (Johnson; Fine) Plaintiffs ignore, however, testimony they themselves elicited that it was the consensus of the principals of the Red Clay schools that more time was necessary to plan for implementation. (Johnson)

Finally, the court notes that the State Board has not yet given the mixed feeder plan its formal approval. At this stage in the proceedings, formal approval of the State Board is a prerequisite to the court's approval for the deviations from the prior orders contemplated by the mixed feeder plan. The court finds that the practicalities weigh against implementation of the mixed feeder plan in 1990.

The court must consider also the importance of allowing educators rather than courts to administer the schools. One of the most important considerations governing the kind of equitable power exercised by a district court in a desegregation case is a "proper respect for the integrity and function of local government institutions." *Missouri v. Jenkins,* —— U.S. ——, 110 S.Ct. 1651, 1663, 109 L.Ed.2d 31 (1990). Local education authorities bear primary responsibility for resolving the problems of desegregation. *Id.; see also Brown II,* 349 U.S. at 299, 75 S.Ct. at 755. This concern has been pervasive in the remedial stages of this litigation:

> The Court's concerns for the important values of local control of the public schools requires that it give special consideration to a proposed modification of its decree when it appears that local authorities may be prepared to assume responsibility where in the past they have defaulted.

*Evans v. Buchanan,* 512 F.Supp. at 850 (footnote omitted). In the motion pending before the court, plaintiffs have *not* asked the court to devise remedial measures in the absence of action by the school authorities; rather, the court has been asked to implement early a plan devised and adopted by the Red Clay Board. Thus, the situation before the court on plaintiffs' motion is not one in which there has been complete abdication of responsibility by local school officials.

Although there is ample evidence in the record that the Red Clay Board unduly delayed in agreeing on a plan to address the racial disparities, it has adopted a plan, albeit belatedly. The Board recommended that the Plan be implemented in 1991, and the State Board acquiesced. Although the plaintiffs urge the benefits of implementing the Plan in 1990, Dr. Varsalona, an experienced educator, current Chairman of the Desegregation Advisory Committee, and witness for the plaintiffs, admitted that reasonable educators could disagree in good faith on the efficacy of implementing the mixed feeder plan in 1990 as opposed to 1991.

Plaintiffs urge the court to infer from the evidence that, absent a court order, the Red Clay officials will not take action in 1991, especially if the choice component of the Plan is not ready for implementation by that time. Indeed, so replete is this record with evidence of delay, obfuscation, and

recalcitrance on the part of the Red Clay Board with respect to remedying the racial disparities in the Red Clay schools by reassigning students that there is no need to recite specifics. On this record, plaintiffs are not entirely unjustified in their allegation that the Red Clay Board will not reassign students unless ordered to do so by the court or the State Board.

There is some countervailing evidence, however, that the Red Clay Board will act to remedy the racial disparities in 1991. The most obvious evidence is the fact that the Board at long last has adopted a plan which includes the reassignment of students. Further, the members of the Board and their counsel urged the Board's commitment that implementation of the Plan will occur in 1991. Pointing to their own counsel's repeated failure to obtain from the Board witnesses any guarantee that the mixed feeder plan would be implemented in 1991, regardless of the availability of the choice component, and other evidence of the Board's preference that the mixed feeder and choice components be considered and implemented together, plaintiffs seek to cast doubt upon the strength of the Board's commitment to the mixed feeder plan in 1991 in the event that the choice component proves unworkable at that date. However, plaintiffs can no more "guarantee" that defendants will *not* implement the mixed feeder plan in 1991 than defendants can "guarantee" that they will. The court, like the parties, cannot project the future with certainty. It therefore makes no finding on whether the choice component can be readied for implementation in 1991 or whether the Red Clay Board will implement the mixed feeder plan in 1991 even if the choice component cannot be implemented at that time.

The court notes, however, Mr. Fine, the president of the State Board, gave the court his unqualified commitment, including a pledge to seek the aid of the court if necessary, that the mixed feeder plan will be implemented in the Red Clay District by September 1991 irrespective of the State Board's action on the choice component. Obviously, the six-year history of failure to develop and implement a satisfactory reassignment plan could well be considered an abdication of responsibility by the State and local education authorities if it appeared that there would not be implementation in September 1991.

The court has considered the need for further remedial measures in order to achieve the maximum practicable desegregation to which plaintiffs are entitled. It has also taken into consideration evidence of the Board's prior recalcitrance regarding the mixed feeder plan. The court shares plaintiffs' concerns regarding the fate of the mixed feeder plan in the event the choice component proves unworkable by 1991. I cannot, however, ignore the practical difficulties inherent in implementing the mixed feeder plan in 1990 and the evidence that the Red Clay Board will move to remedy the racial disparities in 1991 now that it has finally agreed upon a plan. Further, the State Board has not yet formally approved the mixed feeder plan, and the court is reluctant to preempt the State Board by ordering implementation prior to full consideration of the plan by the State Board. The court will not order implementation of the mixed feeder plan in September 1990 based upon this record.

The Coalition has raised two peripheral matters. They seek a declaration of the court that Hispanic students in the Bilingual program at A.I. duPont High School should not be counted as part of that school's minority population. Plaintiffs also desire a court order requiring their full participation in all State Board decisions and proceedings affecting the Red Clay District. The court will now address these peripheral issues.

I will first consider whether Hispanic students in the Bilingual program at A.I. duPont High School should be counted as part of the minority student population at that school. Plaintiffs' challenge to the inclusion of these students in the minority student population at A.I. duPont High School is an indirect challenge to the merits of the proposed Red Clay mixed feeder plan because it effects the school's compliance with the $+/-$ 10% guideline. Two

**594**

preliminary observations are in order. First, the Bilingual Program serves students from all four of the school districts affected by the court's desegregation orders. Second, black students are not the only minority population with a stake in this litigation. Although they take no position on this particular issue, the class of Hispanic students long ago intervened as plaintiffs and are part of this lawsuit. Hispanic students in the general school population should be counted as part of the minority population of that particular school. *Evans v. Buchanan,* 416 F.Supp. at 360 (Hispanic students are counted as part of the minority population for the purpose of determining whether a particular school is racially identifiable). Plaintiffs argue that the Bilingual students are not part of the general school population but rather a self-contained unit having minimal interaction with the rest of the student body. They argue from this that those Hispanic students in the Bilingual Program should not be counted as part of the minority population of A.I. duPont High School. The evidence, however, shows that plaintiffs' contention is not entirely correct as a factual matter. Although 247 of the 412 classes at A.I. duPont have no Hispanic students in attendance (DiEmedio; PX 36), the evidence shows that many of the Bilingual students spend a substantial portion of their school days attending "mainstream" classes. For instance, only 29.9% of the courses attended by the twelfth grade Bilingual students are self-contained Bilingual classes. The remaining 70.1% are mainstream courses attended by the general student population. (DiEmedio; RC 1) Further, the principal of A.I. duPont High School testified that the Bilingual students attend mainstream homerooms and participate, to at least some degree, in numerous mainstream extracurricular activities, such as student elections. (DiEmedio) Plaintiffs are correct, however, that some of the Bilingual students, most notably those in the ninth grade, spend a significant amount of the school day isolated from the general student population. (Molock; DiEmedio; RC 1)

The court does not presume, based upon the record before it, to have anything like a complete understanding of the interaction between the Bilingual students and the general student population at A.I. duPont High School. It finds, however, that there is at least some interaction. It also finds that to some degree the Bilingual students are isolated from the other students.

Plaintiffs have not cited any case in which students in a Bilingual program were not considered as part of the minority student population. It is an unassailable proposition that Hispanic students, whether or not they are in a Bilingual program, are a minority. At the same time, however, to the extent these Hispanic students are in self-contained Bilingual classes, they do not interact with and are not part of the general student population. Given that both of the above propositions are correct, it would appear that the State Board, not the Court, should make what is in essence a policy decision. It follows the State Board may choose to count the entire Bilingual student population as a minority. Conversely, it may opt to determine a percentage of the Bilingual students which should not be included in the minority population at A.I. duPont High School. Neither choice would be wrong. The State Board is cautioned, however, that if it chooses the "percentage" approach it superficially appears the absolute number resulting from the percentage excluded from calculation of the minority population at the high school should also not be counted as part of the school's general population. Otherwise, the statistics would be skewed. Not having the benefit of any testimony on the statistical consequences, the court is at a loss as to what the State Board would then do with the number of Bilingual students not counted in any student population.

■ Finally, the Coalition has moved that it be "fully consulted and heard in all State Board proceedings on the Red Clay District, including all meetings and hearings conducted by the State Board." (Dkt. 1261) Plaintiffs' motion will be denied. Despite some lapses, most notably the State Board's failure to notify quickly the

Coalition that Red Clay had been given additional time to present a student assignment plan, the record amply demonstrates that the State Board has for the most part kept the lines of communication open and the Coalition informed of events concerning this litigation. (PX 1–35, 1–36, 1–44, 1–46, 1–49, 1–59, 1–61, SB 16) In addition, the Coalition through its counsel has conceded to the court on several occasions, both in this proceeding and in an April proceeding, that it is pleased by the increased degree of cooperation demonstrated by the State Board in recent years. *E.g.*, Transcript of hearing of April 2, 1990 at 51 ("[T]he action taken by the State Board of Education within the past few years has been altogether refreshing from the standpoint of the plaintiffs...."). Although the State Board has on occasions, such as the one presently before the court, taken action contrary to the Coalition's preferences, the plaintiffs have not made any showing that they need a court order to make their views known to the State Board.

Further, granting the Coalition's motion as it is worded would place an undue burden on the State Board. The State Board's responsibilities go beyond supervision of the dismantling of the dual school system. Moreover, any statewide policy reached by the State Board would naturally affect the Red Clay District. Plaintiffs' motion requests access to the State Board for *all* matters concerning the Red Clay District, including matters that have nothing to do with this litigation. Granting plaintiffs' motion would cause undue interference with the State Board's ability to carry out its duties. Moreover, the Coalition represents only one of many special interests who desire the ear of the State Board. If plaintiffs were granted full consultation with the State Board, other interested groups would soon demand similar treatment and further disrupt operation of the State Board.

Finally, while there has been a new atmosphere of cooperation between the Coalition and the State Board, they remain adversaries in this litigation. As such, the State Board has the right to plan litigation strategy and consult with its attorneys outside the presence of its legal adversary. For all of these reasons, plaintiffs' motion for full access to the State Board on all matters concerning the Red Clay District will be denied.

An order conforming to this Opinion will be entered.