

1996 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-24-1996

# Coalition Save v. Bd Ed DE

Precedential or Non-Precedential:

Docket 95-7452

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1996

Recommended Citation

"Coalition Save v. Bd Ed DE" (1996). *1996 Decisions.* Paper 110.
http://digitalcommons.law.villanova.edu/thirdcircuit_1996/110

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1996 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

_____

No. 95-7452
_____

COALITION TO SAVE OUR CHILDREN,

Appellant

v.

STATE BOARD OF EDUCATION OF THE STATE DELAWARE;
BOARD OF EDUCATION OF THE CHRISTIANA SCHOOL DISTRICT;
BOARD OF EDUCATION OF THE BRANDYWINE SCHOOL DISTRICT;
BOARD OF EDUCATION OF THE COLONIAL SCHOOL DISTRICT;
THE BOARD OF EDUCATION OF THE RED CLAY SCHOOL DISTRICT;
DELAWARE HOUSE OF REPRESENTATIVES COMMITTEE ON DESEGREGATION

_____

Appeal from the United States District Court
for the District of Delaware
(D.C. Civil No. 56-01816)
_____

Argued:  Tuesday, March 12, 1996

Before: NYGAARD, SAROKIN and ALDISERT, Circuit Judges

(Filed July 24, 1996)

_____

Thomas D. Barr
David Boies (argued)
Sandra C. Goldstein
Katherine B. Forrest
CRAVATH, SWAINE & MOORE
Worldwide Plaza
825 Eighth Avenue
New York, New York  10019

Thomas J. Henderson (argued)
Pace J. McConkie
LAWYERS' COMMITTEE FOR CIVIL
  RIGHTS UNDER LAW
1450 G Street, N.W.
Washington, D.C.  20005

Leonard L. Williams
1214 King Street
Wilmington, DE    19801

        ATTORNEYS FOR APPELLANT


Andre L. Dennis
STRADLEY, RONON, STEVENS & YOUNG
2600 One Commerce Square
Philadelphia, PA  19103-7098

Mary B. Matterer
STRADLEY, RONON, STEVENS & YOUNG
One Rodney Square, 8th Floor
P.O. Box 2170
Wilmington, DE  19899-2170

        ATTORNEYS FOR
        AMICUS CURIAE - CITY OF
        WILMINGTON, DELAWARE

Rodman Ward, Jr. (argued)
Andre G. Bouchard
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899

John B. Hindman
Department of Justice
45 The Green
Sykes Building
Dover, DE    19901

        ATTORNEYS FOR APPELLEE
        STATE BOARD OF EDUCATION
        OF THE STATE OF DELAWARE

M. Duncan Grant
PEPPER, HAMILTON & SCHEETZ
18th & Arch Streets
3000 Two Logan Square
Philadelphia, PA    19103

Alfred J. D'Angelo, Jr.
Daniel V. Folt
PEPPER, HAMILTON & SHEETZ
1201 Market Street
Suite 1401
Wilmington, DE    19801

        ATTORNEYS FOR APPELLEE

RED CLAY CONSOLIDATED
SCHOOL DISTRICT


David H. Williams
Barbara D. Crowell
MORRIS, JAMES, HITCHENS &
  WILLIAMS
222 Delaware Avenue
P.O. Box 2306
Wilmington, Delaware  19899

        ATTORNEYS FOR APPELLEES
        BRANDYWINE, CHRISTIANA
        AND COLONIAL SCHOOL
        DISTRICTS

Charles J. Cooper (argued)
SHAW, PITTMAN, POTTS &
  TROWBRIDGE
2300 N Street, N.W.
Washington, D.C.  20037

        ATTORNEYS FOR APPELLEE
        DELAWARE HOUSE OF
        REPRESENTATIVES COMMITTEE
        ON DESEGREGATION

———————————————


OPINION OF THE COURT
———————————————

TABLE OF CONTENTS

I.    Introduction . . . . . . . . . . . . . . . . . . . . . . . 4

II.   Procedural History . . . . . . . . . . . . . . . . . . . 6

III.  Scope of Review. . . . . . . . . . . . . . . . . . . . .11

IV.   Unitary Status . . . . . . . . . . . . . . . . . . . . .13

V.    Green Factors. . . . . . . . . . . . . . . . . . . . . .18

        A. Student Assignment . . . . . . . . . . . . . . .18
        B. Faculty and Staff Assignments. . . . . . . . . .32
        C. Extracurricular Activities . . . . . . . . . . .37
        D. Remaining Green Factors. . . . . . . . . . . . .39

VI.      Ancillary Relief . . . . . . . . . . . . . . . . . .39

        A. In-service Training. . . . . . . . . . . . . . .41
        B. Reading and Communication Skills . . . . . . . .44

    C. Curriculum . . . . . . . . . . . . . . . . . . . . . .48
    D. Counseling and Guidance. . . . . . . . . . . . . . .50
    E. Human Relations. . . . . . . . . . . . . . . . . . .52
    F. Discipline . . . . . . . . . . . . . . . . . . . . .53

VII.  Areas of Concern to the District Court and
       Allocations of the Burden of Proof. . . . . . . . .57

VIII. Conclusion . . . . . . . . . . . . . . . . . . . . . . .64

ALDISERT, Circuit Judge
                    I.   Introduction
     This case brings to a close our supervision of more than four decades of litigation designed to desegregate the public schools of Delaware.

     However, we do not end our supervision hastily.  After the Delaware schools' rudimentary attempts at desegregation were deemed insufficient by the district court in 1957, and by this court in 1960, judges of this circuit blazed new jurisprudential trails in 1975 by requiring an interdistrict remedy.  By 1977 and 1978, the judiciary had fashioned detailed orders for primary and ancillary relief which, together with the factors set forth by the Supreme Court in Green v. County School Bd. of New Kent County, Va., 391 U.S. 430 (1968), constituted the marching orders for the school system.

     Still, it was not until almost 20 years later (and 35 years after this court announced dissatisfaction with an original plan that called for grade-by-grade desegregation over a 12-year period) that the district court could announce that the marching orders had been obeyed:  The school system has achieved unitary status by complying in good faith with our detailed desegregation decrees and by eliminating to the extent practicable the vestiges of de jure segregation.  This was the ruling of the district court embodied in a judgment entered after a lengthy hearing. The Coalition to Save Our Students ("Coalition"), the representative of the plaintiff class, has appealed.  We will affirm.

     It is beyond dispute that racism and bigotry continue to tear at the fragile social fabric of our national and local communities, and that our best efforts as citizens are needed to address this problem at many levels.  However, as the district court observed in the case at hand, court-supervised school desegregation alone cannot eliminate racial discrimination:

> [A]s the years have passed since Brown I and II [Brown v. Board of Educ., 347 U.S. 483 (1954) and Brown v. Board of Educ., 349 U.S. 294 (1955)], it has become apparent that the school desegregation process has been unable to eliminate or overcome racial discrimination in the "myriad factors of human existence" outside the school environment . . . .

Coalition to Save Our Children v. State Bd. of Educ. of State of Del., 901 F. Supp. 784, 823 (1995) (quoting Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 22 (1971)).  Or as the Court succinctly put it in Swann: "One vehicle can carry only a

limited amount of baggage.  It would not serve the important objective of Brown I to seek to use school desegregation cases for purposes beyond their scope . . . ."  Swann, 402 U.S. at 22.

In light of this sobering truth, it is all the more important that we write the final chapter in this long period of supervision by the federal courts and release our provisional grip on the administrators and educators of Northern New Castle County, for only in so doing can we permit them to resume their full role in the larger social and political effort to make our nation worthy of the best ideals of its members.  The length of the discussion that follows is but one indication of the importance and sensitivity of the task at hand.

## II.  Procedural History

Historically, Delaware required its public school pupils to attend segregated schools.  Del. Const. art. 10  2 (1950) and Rev.Code 1935  2631.  However, even before the landmark decision in Brown v. Board of Education, 347 U.S. 483 (1954) (Brown I), the Delaware courts ordered the admission of black children to certain schools previously attended only by white children. Belton v. Gebhart, 87 A.2d 862, aff'd 91 A.2d 137 (Del. 1952). The Supreme Court consolidated Belton with Brown I and affirmed, 347 U.S. 483, holding that racial segregation of public school students deprived the minority group children of equal educational opportunities, in violation of the Equal Protection Clause.  See Brown I, 347 U.S. 483 (1954).  The Court again affirmed Belton v. Gebhart in Brown v. Board of Education, 349 U.S. 294 (1955) (Brown II), remanding to the Supreme Court of Delaware for further proceedings to require "a prompt and reasonable start toward full compliance" with Brown I and "to effectuate a transition to a racially nondiscriminatory school system . . . with all deliberate speed."  Brown II, 349 U.S. at 300-01.

Yet notwithstanding the end of de jure segregation, the City of Wilmington continued to operate many racially identifiable schools.  Accordingly, the district court fashioned an inter-district remedy to eliminate the vestiges of segregation and, faced with the state authorities' adamant and prolonged refusal to discharge their responsibilities, issued a remedial decree in 1978.  The 1978 Order required a 9-3 student assignment plan, which provided that all students would attend formerly predominantly "white" suburban school districts for a maximum of nine years and would spend at least three years in the formerly "black" school districts.

The 1978 Order also directed eight forms of ancillary relief "necessary and essential to . . . overcome the vestige effects of de jure segregation," including: (1) an in-service training program for teachers; (2) an affirmative reading and communication skills program; (3) new curriculum offerings; (4) a nondiscriminatory counseling and guidance program; (5) a human relations program; (6) codes of conduct providing for nondiscriminatory discipline; (7) the reassignment of faculty and staff; and (8) nondiscriminatory guidelines for construction and maintenance of school buildings.  Evans v. Buchanan, 582 F.2d

750, 770–774 (3d Cir. 1978) (in banc).

In 1981, the district court permitted the state to reorganize the judicially-created school district into the current four districts -- Brandywine, Christiana, Colonial and Red Clay. Evans v. Buchanan, 512 F. Supp. 839 (D. Del. 1981). In so doing, Judge Schwartz asserted that, notwithstanding the continued existence of "problems that may be characterized as vestige effects of de jure segregation, . . . [the] four-district plan is viewed as a good faith effort to respond to repeated judicial invitations for appropriate State authorities to come forward with their own meaningful solutions to vexing problems." Id. at 863, 874. However, because Judge Schwartz found the "effort [to have] fallen short of the mark in the critical area of pupil assignment," he deferred for 60 days any order regarding the State Board's motion for modification of the desegregation decree in order to encourage "curative legislation" on the matter. Id. at 872–74.

In 1990, Judge Schwartz made a specific finding that one of the districts (Red Clay) had failed to comply in good faith with the 1978 order. Coalition to Save Our Children v. Buchanan, 744 F. Supp. 582, 587–93 (D. Del. 1990). Judge Schwartz stated that "the vestiges of prior official segregation [had not] been eradicated 'root and branch' from either the Red Clay District as a whole or from its student assignment patterns." Id. at 587. Indeed, Judge Schwartz found that the record was "replete . . . with evidence of delay, obfuscation, and recalcitrance on the part of the Red Clay Board with respect to remedying the racial disparities" in that district. Id. at 592–93.

In 1991, Judge Schwartz stated that, notwithstanding the Red Clay District's "technical compliance with this court's orders," he again had "very grave doubts concerning the [Red Clay] Board's good faith compliance with the spirit of desegregation," and thus could "not make a finding that the Red Clay District [was] operating in compliance with the Equal Protection Clause . . . ." Coalition to Save Our Children v. State Bd. of Educ., 757 F. Supp. 328, 349–350 (D. Del.1990).

Four years later, upon motion by the Delaware State Board of Education for a declaration of "unitary status," the district court concluded:

> that the defendants have complied in good faith with the desegregation decrees issued in this litigation, that the defendants are unlikely to return to the segregative practices of their predecessors, and that the vestiges of past discrimination have been eliminated to the extent practicable.

Coalition, 901 F. Supp at 823–824. The opinion accompanying the order set forth 308 factual findings, which discussed: (a) compliance with what have become known as Green factors (as originally suggested in Green v. County School Board, 391 U.S. 430 (1968)) -- student assignment, faculty and staff assignment, transportation, extracurricular activities, and facilities; (b) compliance with the ancillary relief provisions, endorsed by this court sitting in banc, see Evans v. Buchanan, 582 F.2d at 769-74;

and (c) student achievement, special education and dropout rates, which the district court labelled "Areas of Concern." See Coalition, 901 F. Supp. at 818-22. Appellant conceded compliance with two of the Green factors (transportation and facilities) and one of the ancillary relief provisions (also concerning facilities).

The district court had jurisdiction under 28 U.S.C. 1331 (1988). We have jurisdiction pursuant to 28 U.S.C. 1291 (1988). Appeal was timely filed under Rule 4(a), Federal Rules of Appellate Procedure.

## III. Scope of Review

The Coalition's appeal presents us with three fundamental questions for consideration: first, whether the district court properly concluded that the four school districts of Northern New Castle County achieved unitary status by complying in good faith with the desegregation decree and by eliminating to the extent practicable the vestiges of past discrimination; second, whether the district court properly allocated to Appellant the burden of proving that certain racial disparities in student performance are proximately related to de jure segregation; and third, whether the district court properly excluded certain expert testimony proffered by Appellant.

The appeal to this court from the order declaring unitary status tracks a very narrow compass. Because the district court's finding that the school districts have achieved unitary status is factual, our review of that finding is limited to the clearly erroneous standard. Vaughns by Vaughns v. Bd. of Educ. of Prince George's County, 758 F.2d 983, 990 (4th Cir. 1985); United States v. Texas Educ. Agency, 647 F.2d 504, 506 (5th Cir. 1981), cert. denied, 454 U.S. 1143 (1982); Keyes v. School Dist. No. 1, Denver, Colo., 895 F.2d 659, 666 (10th Cir. 1990), cert. denied, 498 U.S. 1082 (1991); Jacksonville Branch, NAACP v. Duval County School Board, 883 F.2d 945, 952 n.3 (11th Cir. 1989). A finding of fact is clearly erroneous only if the court has "the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948). Further, "[i]t is the responsibility of an appellate court to accept the ultimate factual determination of the fact-finder unless that determination either (1) is completely devoid of minimum evidentiary support displaying some hue of credibility, or (2) bears no rational relationship to the supportive evidentiary data." Krasnov v. Dinan, 465 F.2d 1298, 1302 (3d Cir. 1972).

We have plenary review of all questions of law. This includes a district court's choice, interpretation and application of the law to the historical facts. Louis W. Epstein Family Partnership v. Kmart Corp., 13 F.3d 762, 765-66 (3d Cir. 1994). Accordingly, this court undertakes plenary review of the district court's allocation of the burdens of proof.

Finally, we review the district court's determination of the admissibility of expert testimony for abuse of discretion. United States v. Theodoropoulos, 866 F.2d 587, 590 (3d Cir.

1989).

                        IV.  Unitary Status
     The primary legal issue before us is whether the Northern
New Castle County school districts have fulfilled their
affirmative duty to eliminate the former dual school system.  The
ultimate end to be brought about by a desegregation remedy is "a
unitary, nonracial system of public education."  Green, 391 U.S.
at 436.  A school system achieves this unitary status when it no
longer discriminates between school children on the basis of
race.  See id. at 442.  And a school system no longer
discriminates among school children on the basis of race when it
affirmatively has eliminated all vestiges of state-imposed
segregation.  Id. at 435, 437-38 (school board charged with
affirmative duty to eliminate racial discrimination "root and
branch"); Swann, 402 U.S. at 15 ("the objective today remains to
eliminate from the public schools all vestiges of state-imposed
segregation").  Thus our task, simply put, is to determine
whether the district court clearly erred in finding that the
vestiges of de jure segregation have been eliminated in the
Brandywine, Christiana, Colonial and Red Clay school districts.
Green, 391 U.S. at 435; see also Missouri v. Jenkins, ___ U.S.
___, 115 S. Ct. 2038, 2055-56 (1995).
     A critical starting point in identifying vestiges of
discrimination is the degree of racial imbalance in the school
districts.  This inquiry is fundamental, because under the former
de jure regime, racial exclusion was both the means and the end
of a policy motivated by disparagement of, and hostility towards,
the disfavored race.  The Court's 1968 opinion in Green squarely
addressed this issue, noting that "[t]he pattern of separate
`white' and `Negro' schools . . . established under compulsion of
state laws is precisely the pattern of segregation to which Brown
I and Brown II were particularly addressed."  Green, 391 U.S. at
435.  However, the Green Court also made clear that in examining
the problem of racial imbalance in our schools, we are to look
"not just to the composition of student bodies . . . but to every
facet of school operations -- faculty, staff, transportation,
extracurricular activities and facilities."  Id.; see also Swann,
402 U.S. at 18 (the Green factors are "among the most important
indicia of a segregated system.")  Because compliance with Greenfactors is
a condition precedent to unitary status, we will
survey each of those factors here.
     Nevertheless, the Green factors, which address racial
imbalance, are not the only criteria by which we are to evaluate
whether the school districts have achieved unitary status.  We
must also consider the eight programs of "ancillary remedial
relief" prescribed by this court in 1978, including: (1) an in-
service training program for teachers; (2) an affirmative reading
and communication skills program; (3) new curriculum offerings;
(4) a nondiscriminatory counseling and guidance program; (5) a
human relations program; (6) codes of conduct providing for
nondiscriminatory discipline; (7) the reassignment of faculty and
staff; and (8) nondiscriminatory guidelines for construction and
maintenance of school buildings.  Evans v. Buchanan, 582 F.2d at

769-74.  Thus we will survey compliance with these ancillary relief measures as well.

By considering both the Green factors and the eight measures of ancillary relief ordered by this court in 1978, we honor the mandate set forth by the Supreme Court in Dowell that a school board under federal supervision "is entitled to a rather precise statement of its obligations."  Bd. of Education of Okla. City Public Schools, Indep. School Dist. No. 89, Oklahoma County, Okl. v. Dowell, 498 U.S. 237, 246 (1991) (citing Pasadena City Bd. of Educ. v. Spangler, 427 U.S. 424 (1976)).  Together, the Greenfactors and the ancillary remedial relief measures constitute these obligations, and thus precisely frame our inquiry as we determine whether the district court properly ordered the withdrawal of federal supervision.  The essence of that inquiry recently was articulated by the Supreme Court:

> whether the [constitutional violator] ha[s] complied in good faith with the desegregation decree since it was entered, and whether the vestiges of past discrimination ha[ve] been eliminated to the extent practicable.

Freeman v. Pitts, 503 U.S. 467, 492 (1992).

Given the Court's recent assertion that federal supervision of local school districts "`was intended as a temporary measure to remedy past discrimination,'"  Jenkins, ___ U.S. ___, 115 S. Ct. at 2049 (quoting Dowell, 498 U.S. at 247), we underscore that the phrase "to the extent practicable" implies a reasonable limit on the duration of that federal supervision.  Indeed, to extend federal court supervision indefinitely is neither practicable, desirable, nor proper.

We are keenly aware that, for as long as we have imposed federal supervision on local school boards, those bodies have suffered the loss of their defining function -- control over their own schools.  Thus in the present matter the citizens of the New Castle school districts have been denied for nearly 20 years what the Court has described as the "vital national tradition" of "local autonomy of school districts."  Freeman, 503 U.S. at 490 (quoting Dayton Bd. of Educ. v. Brinkman, 433 U.S. 406, 410 (1977)).  Additionally, we appreciate the extended social and economic burdens that continued supervision would impose on generations of innocent school children and their families.  The reality of these burdens becomes clear when we consider that a child who entered first grade in one of the Northern New Castle County school districts in 1976 under federal court supervision is now 26 years old, and possibly a parent with a child of his or her own in the same judicially-controlled school system.

Our concern for the autonomy of local school systems and their members is consistent with the established jurisprudence of desegregation: a fundamental purpose of our mandate to eliminate the dual system has been to encourage local school districts independently to provide high-quality educational opportunities for all students, a state of affairs made possible only in "a unitary, nonracial system of public education."  Green, 391 U.S. at 436.  Were we to allow federal supervision to continue after a

finding that the school districts have complied with our desegregation mandate, we would effectively preclude those school districts from achieving that goal. In sum, we cannot reconcile the prospect of indefinite federal supervision of local school districts with the ultimate purpose of that supervision -- to foster the creation of autonomous, racially balanced school systems. Accordingly, we will remain attentive to the Supreme Court's repeated instructions that such supervision be "temporary" and "transitional." See, e.g., Jenkins, ___ U.S. ___, 115 S. Ct. at 2049; Dowell, 498 U.S. at 247.

With these teachings in mind, we turn now to the district court's analysis in this case.

## V. The Green Factors

The fundamental issue before the district court was whether the desegregation measures taken by the school districts had effectively eliminated to the extent practicable the vestiges of the former dual school system. In addressing this issue, the district court began by scrutinizing various educational factors initially identified by the Court in Green: student assignments, faculty, staff, facilities and resources, transportation, and extra-curricular activities. Green, 391 U.S. at 435. We address the district court's consideration of each of these factors in turn.

## A. Student Assignment

Because the crux of the original constitutional violation was the legalized system of segregated schools, the traditional remedy for the violation was to desegregate the schools through student reassignment. Accordingly, we ordered the consolidation of urban and suburban school districts. See Evans v. Buchanan, 582 F.2d at 759 n.5 (quoting Evans v. Buchanan, 435 F. Supp. 832, 838-39 (D. Del. 1977) (footnotes omitted)). The State Board and districts not only have adhered to the requirements of our student assignment order, but also have attempted to maintain a racial balance by consolidating districts, redrawing attendance zones, and instituting the busing of thousands of students.

Indeed, after the hearing below on the Appellees' motion for unitary status, the district court found that the schools in these districts were "among the most racially balanced schools in the United States." Coalition, 901 F. Supp. at 799. The court's conclusion finds ample support in the record from the testimony of school desegregation expert Dr. Christine Rossell. Using an "index of dissimilarity," Dr. Rossell compared the racial balance in the four districts to a national sample of 76 similar districts, analyzing both the percentage of students in schools with certain variances and the percentage of schools themselves within certain variances.

Dr. Rossell observed that, as measured against this index, the four Northern New Castle County school districts have achieved "close to perfect racial balance." Further, on the basis of her full analysis, Dr. Rossell concluded that these districts "are much less racially imbalanced than . . . [the] national comparison group." JA 568; see also Coalition, 901 F.

Supp. at 797.  Because the district court's finding of racial balance rests on Dr. Rossell's thorough analysis, it is not clearly erroneous.  See Krasnov, 465 F.2d at 1302 (an appellate court must "accept the ultimate factual determination of the fact-finder unless that determination . . . is completely devoid of minimum evidentiary support displaying some hue of credibility . . .").

Appellant does not contest the findings of racial balance among schools, but argues nonetheless that segregation persists within those buildings, in classrooms and programs.  More specifically, Appellant contends that black students are over-represented in certain classes, such as special education, and under-represented in others, such as gifted and advanced placement classes.  However, we are mindful that in Milliken v. Bradley, 418 U.S. 717, 740-41 (1974), the Court held that the Constitution "does not require any particular racial balance in each school, grade or classroom."  See also Oliver v. Kalamazoo Bd. of Educ., 640 F.2d 782, 809 (6th Cir. 1980) (rejecting notion that school system is not unitary if black students are over- or under-represented in various academic courses).  Moreover, the district court actually made 19 findings concerning the circumstances of student assignments in the classrooms, concluding that classroom balance throughout the districts was exemplary.  Coalition, 901 F. Supp. at 800 (measured against a national sample, classroom imbalance in Northern New Castle County was one-third to one-half that of other schools).  We review these findings for clear error.

First, although the district court's findings of classroom racial balance exclude special education classes, there is no clear error.  In our 1978 desegregation order we expressly excepted "students presently attending and who in the future may attend . . . special education school facilities and such other similar special school facilities as presently exist or may be hereafter established . . . ."  JA 128 (Evans v. Buchanan, Civil Action Nos. 1816-1822, Order at 11 (D. Del. Jan. 9, 1978)).  The rationale for this exception is obvious and compelling: students -- black or white -- should not be mainstreamed (i.e., denied special education meant to address special learning needs and problems) merely to effect a racial balance.

Appellant is also unpersuasive in asserting that students are placed in special education programs (such as "intensive learning centers") simply because they are black.  Although in each of the four districts the percentage of black students in special education programs exceeds the percentage of blacks in the overall student population, the record demonstrates that the school districts classify students based on neutral, non-discriminatory state and federal criteria.  JA 829-34.  Additionally, the districts make periodic re-evaluations of special education students to determine when they can return to regular classes.  Id.  Placement is not mandatory, because at several junctures, parents are empowered to reject the school's recommendation to place their child in special education classes.  JA 830, 832-33.  Moreover, we note that the Appellee State Board has created numerous statewide special education task forces; has

authorized five comprehensive studies relating to special education; and thoroughly has investigated intervention strategies, mainstreaming and the application of selection procedures. JA 1223, 1243.

The Appellees' efforts to improve racial balance within these programs not only are commendable, but successful. Indeed, in three of the four districts, the racial imbalances have declined. Although we might hope -- even expect -- that this imbalance will soon disappear, the mere fact that black students remain over-represented in special education classes does not make clearly erroneous the district court's finding of unitary status. Given that Dr. Reschly, in summarizing his comprehensive analysis, concluded that in these school districts "special education is not used as a means to separate students by race," Coalition, 901 F. Supp. at 821; JA 839, we will accept the court's finding on this issue. See Krasnov, 465 F.2d at 1302 (standard of review).

Similarly, Appellant argues that the district court's findings with regard to classroom assignment are clearly erroneous because black students are under-represented in non-special education classes. This argument relies on, inter alia, the district court's finding 47: "[t]here is evidence that among high school students who achieve identical testing scores, black students were more likely to be placed in the lower level class than were white students." Coalition, 901 F. Supp. at 801 (footnote omitted); JA 1385; JA 4249; JA 4305-07. To be sure, this finding is potentially troubling, suggesting on its face that black students may have been segregated from white students of equal testing aptitude. However, we must consider this finding in the full context in which it was examined and presented by the district court. Thus we must consider that in footnote 30, which accompanies this finding, the district court noted that "[t]he comparison apparently does not include academic achievement as measured by course performance, or whether such placement was requested or required." Id. Because this comparison relied on testing aptitude alone, rather than considering as well the important factor of academic achievement based on course performance, and because it is not clear whether the placement at issue was requested or required, we do not consider finding 47 to be evidence that black students have not received equal opportunity, nor can we reasonably conclude that the district court, upon its careful examination, clearly erred.

We observe also finding 48, which states that "[o]n the other hand, the percentage of minorities enrolled in honors and AP classes who scored over the 75th percentile in reading or math in the spring of 1993 is slightly greater than that of whites in all 4 school districts." Coalition, 901 F. Supp. at 801; JA 6259. Although this finding could, as urged by Appellant, give rise to an inference that blacks must perform at a higher level than whites in order to be placed in honors and AP classes, that is not the sole inference that could be drawn from so limited, and thus malleable, a sample. Indeed, on the basis of finding 48 alone we may just as reasonably infer something quite different: that the school districts' good faith efforts to desegregate have

paid off in terms of the improved testing performance of black students.

In any event, our task here is not to engage in such broad speculation, nor to choose among possible inferences from the data; rather, we are to inquire whether the district court's determination of the districts' unitary status was clearly erroneous. To accord this finding its proper value, therefore, it must be considered in the context of other, related findings. This the district court did. Indeed, in view of the district court's copious research, we are assured that the court interpreted this finding in the proper light in determining that the districts have achieved unitary status.

At the urging of Appellant, we also have examined carefully the district court's finding 36, which states that "[t]he extent to which elementary and middle school students are placed in classes according to their ability is unclear from the record." Coalition, 901 F. Supp. at 800; JA 4214-21. This finding means little on its own, for it represents merely that there is uncertainty in the record about how elementary and middle school students are placed in classes according to their ability. Indeed, without further amplification, we are not persuaded to conclude that this statement cuts against the court's determination regarding the districts' good faith efforts to eliminate de jure segregation. Again, we are required to place this finding in context, bearing in mind that because few elective classes or courses are available to students at the elementary and middle school levels, the selective process for students is far more meaningful at the high school level. Thus we must consider finding 36 in light of findings 39, 40 and 45.

Finding 39 describes the high school class selection process as involving "class presentations by guidance counselors, booklets with course descriptions, application by students in consultation with family, individual guidance from guidance counselors, and teacher input." Coalition, 901 F. Supp. at 800; JA 755-56, 771-72, 851-54, 863-66. Not only is high school class selection the product of these various deliberations, but, according to finding 40, "[t]he parents and student have the ultimate say in the level to which the student is assigned." Coalition, 901 F. Supp. at 800; JA 1383.

And although finding 36 indicates that the record is unclear on how elementary and middle school students are placed in classes according to their ability, finding 45, when considered in its entirety, provides detailed information about the class placement of high school students as set forth in the margin.

Accordingly, when we consider Finding 36 in the context of these other relevant findings, we find unavailing the contention that finding 36 provides significant evidence that minority students have not received an equal opportunity to succeed in the pertinent school districts. The district court's multiple findings on this particular issue suggest that the court did indeed consider "every facet of school operations" in determining that the districts have achieved unitary status.

Finally, we note finding 49 of the district court's opinion, which states that "[t]here is evidence that lower levels of

instruction may not encourage achievement and may adversely affect the ability of a student to attend college." Coalition, 901 F. Supp. at 801; PX 2262 at 82; PX 2265. As with the foregoing findings, although this finding may be considered troubling on its face, alone it is neither definitive nor substantial enough to show clear error in the district court's determination of unitary status. The mere finding that evidence exists "that lower levels of instruction may not encourage achievement and may adversely affect the ability of a student to attend college," id., does not establish anything specific about whether that putative problem is related to disparate educational opportunity or treatment according to race.

Of course, this finding is obvious and indisputable as far as it goes: when students receive lower levels of instruction, they are less likely to feel encouraged to achieve and thus will be less likely to attend college. Yet this truism merely serves to underscore the more fundamental question at issue here -- on what basis are students placed in "lower levels of instruction"? As we already have made clear, that basis was not racially discriminatory; the record does not support the claim that students of one race are afforded college preparation opportunities (advanced placement classes, counseling, help in preparing for college placement exams) that students of another race are not.

Thus although the finding that "lower levels of instruction may not encourage achievement" is problematic, especially when viewed in isolation, yet when considered in relevant socio-economic context, this statement of mere possibility cannot be regarded as proof that the district court clearly erred in determining that the school districts have achieved unitary status. The district court dutifully presented this finding in combination with many others and, after carefully analyzing these findings in their totality, declared that "there is no credible evidence linking any current racially identifiable conditions to the prior violation" Id. at 823 (footnote omitted).

This, too, must be said. Although the Constitution requires that all of its citizens have equal access to the pursuit of education, and that they be given equal breaks while attending school, it does not insist that they all finish even. The proper test under the Constitution is equality of opportunity, not of results. On this point we would do well to recall Edmund Burke's pithy formulation: "[A]ll men have equal rights, but not to equal things." And indeed, Appellant articulated its commitment to this principle at oral argument: "[w]e have never suggested that the measure here is ultimate equal outcomes."

That everyone does not finish even is tragic, of course, but it does not amount to a constitutional violation. Nor does it violate the school districts' mandate regarding student assignment under Green. Accordingly, we conclude that the district court properly determined that, as to student assignment, the districts achieved unitary status through good faith compliance with the requirements of the 1978 Order.

B. Faculty and Staff Assignments

Before the 1978 consolidation, the vast majority of black administrators and teachers served two predominantly black districts. In September 1978, the districts reassigned faculty, administrative and other certificated staff in all eleven districts. The evidence presented at trial demonstrated that the districts now have balanced their faculties to a degree that is virtually unprecedented among those school districts in this country that operate under court orders. The district court found that the districts closely monitor the racial composition of their faculties and do not hesitate to block transfers and to make reassignments, overriding seniority where necessary, to ensure diverse racial representation at each school. Coalition, 901 F. Supp. at 802–04. The record testimony of senior administrative officials from each of the four districts supports these findings.

Appellant does not refute either the district court's calculations or its conclusion of racial balance among the faculties, but nonetheless argues that the district court's finding that the vestiges of de jure segregation have been eliminated to the extent practicable is clearly erroneous because the overall percentage of minority teachers within the districts has declined by two or three percent since 1982. Appellant's Br. at 10. This gradual decline does not indicate clear error, however, because the shortage of minority teachers in the four school districts is not a vestige of de jure segregation in Northern New Castle County, but rather a manifestation of an unfortunate contemporary national trend. Indeed, even Appellant's expert testified that there is a critical shortage of black teachers in the public schools. JA 1167–68 (the number of black students graduating from colleges in the United States with bachelor degrees in the field of education has declined); see also Freeman v. Pitts, 503 U.S. 467, 482–83 (1992).

The record further reveals that, notwithstanding the shortage of available faculty, the districts hired minority candidates at rates two to four times greater than the available percentage of minorities in regional and national pools. JA 6566. This is attributable in part to the extensive affirmative minority recruitment efforts of each of the four school districts. For example, the Brandywine district has sought to expand its pool of potential minority hires by recruiting not only teachers who have received a degree in education from a 4-year program, but teachers who have received their B.A. or B.S. degrees in fields other than education and have prior teaching experience. JA 620. The Christiana district has attempted to recruit minority teachers by sending announcements to predominantly and historically black universities, by attending career days at predominantly black universities, and by hiring minorities as paraprofessionals. JA 603. The Colonial district has assembled a task force to address minority faculty representation. JA 633. And in the Red Clay district, occasionally a faculty position will be held open until a minority candidate is found. JA 624. Based on this record, the court did not clearly err in finding that the school districts had demonstrated good faith efforts to integrate the faculties of

the schools.

We turn, then, to the racial balance among the "non-professional" or "classified" staff, which includes bus drivers, bus aides, secretarial and clerical positions, paraprofessionals, custodial employees, and food service workers. The undisputed evidence of record establishes that the school districts have attempted to use the hiring process to improve racial balance on the staff as new openings have materialized. For example, Brandywine recruits minority staff through community channels, focusing on community centers, neighborhood churches and community groups in minority areas. JA 621. Similarly, Christiana recruits through community newsletters, community centers, and by "word of mouth." JA 603.

Appellant concedes that the districts have made such efforts, but argues that the districts have not reassigned the staff to maximize racial balance. The district court found that it would be impractical for the districts to reassign these employees in order to attain greater racial balance. We agree.

Food service workers, for example, earn approximately $3200-$4300 per year, working approximately three hours a day. JA 605. Generally, these employees work close to where they live. Transferring them to a distant workplace that would require a long commute simply is not feasible for the salary they receive. Id. Secretarial and clerical personnel would experience a similarly negative economic impact. Id. Even Appellant's expert acknowledged that forced reassignment of these part-time, low-wage employees could create hardships on these workers with respect to child care, commuting time, distance from work and expenses. JA 1105. Accordingly, it was not clearly erroneous for the court to conclude that the districts have eliminated to the extent practicable any residual racial identifiability in the schools with respect to these employees.

We carefully have considered Appellant's contentions with respect to faculty and staff assignment, and we conclude that there was no clear error in the district court's findings.

## C. Extracurricular Activities

Appellant contends that the districts have not eliminated the vestiges of de jure segregation from their extracurricular activities. It is undisputed, however, that all extracurricular activities within the four districts are open to students of all races. All eligibility requirements are race-neutral, and district officials encourage all students, regardless of race, to participate in a wide range of extracurricular activities.

Nevertheless, Appellant argues that the districts must also eliminate any racial identifiability that exists within each of these activities. In findings 98-100, 109-110, 118 and 125-128, the district court indicated that, unfortunately, there exist a substantial number of racially identifiable extracurricular activities throughout the four districts. We cannot, however, expect a school district to compel or deny student participation in non-compulsory extracurricular activities merely to effect a racial balance.

The four districts have removed financial and transportation

barriers to participation.  JA 1164.  Moreover, each of the districts has demonstrated good faith efforts to reduce the racial identifiability of their activities through experimental programs.  For example, the Brandywine district invites all eighth graders and their parents to the high schools to meet representatives from the activities, JA 753; Christiana announces upcoming activities in newsletters and physical education classes, JA 740; middle schoolers in Colonial are recruited to participate in activities when they enter high school, JA 743; and in Red Clay, coaches recruit students and expose them to various sports through the physical education curriculum, JA 680.

We believe that a school district's extracurricular activities are unitary if they "are available to all students within the School District regardless of race."  Singleton v. Jackson Mun. Separate Sch. Dist., 541 F. Supp. 904, 908 (S.D. Miss. 1981); see also Swann, 402 U.S. at 18 ("With respect to such matters as . . . extracurricular activities," it may be enough "to eliminate invidious racial distinctions.").  School districts need not "show equal participation."  Lockett v. Board of Educ. of Muscogee County, No. 991 at 55 (M.D. Ga. Nov. 18 1994) (citing Quarles v. Oxford Municipal Separate School Dist., 868 F.2d 750, 757 (5th Cir. 1989)).  Accordingly, we conclude that the record supports the district court's finding that the districts have eliminated to the extent practicable from their extracurricular activities the vestiges of past de juredischrimination.

D.  Remaining Green Factors (Transportation and Facilities)

There is no dispute among the parties concerning the two remaining factors outlined in Green.  Specifically, transportation is provided on a non-discriminatory basis.  Additionally, the districts successfully have remedied the distinctions between the facilities of the formerly black and formerly white schools.

## VI.  Ancillary Relief

The 1978 order of this court required the implementation of eight specific programs ancillary to the 9-3 pupil assignment plan.  The order required the districts to:

1)  formulate and implement a comprehensive in-service training program for teachers, administrators and other staff in order to train personnel to cope with the desegregation process;

2)  institute an affirmative reading and communication skills program, which does not resegregate the pupils, in order to remedy the effects of the past discrimination;

3)  provide curriculum offerings and programs which emphasize and reflect the cultural pluralism of the students, and all instructional materials, texts and other curriculum aids shall be free of racial bias;

4)  institute an effective and nondiscriminatory counseling

and guidance program.  The counseling and guidance
program must insure that students are counseled on a
racially nondiscriminatory basis concerning all
programs available in the area of work opportunities
and opportunities for a college education;

5)   provide an appropriate human relations program . . .
     [designed] to protect the individual dignity of
     students and teachers and to prevent racial myths and
     stereotypes from prevailing in schools undergoing
     desegregation;

6)   develop . . . a code of rights and responsibilities . .
     . provid[ing] for racially nondiscriminatory discipline
     and . . . contain[ing] provisions to insure each
     student in the desegregation area procedural and
     substantive due process required by existing law.  Such
     a code will help to provide equal educational
     opportunity to all students by protecting them from
     unreasonable, discriminatory, and arbitrary rules; and
     the Board shall not administer the code on a racially
     selective or otherwise biased basis;

7)   reassign faculty, administrative and other staff
     personnel to insure that schools do not retain their
     former racial identity through racially identifiable
     faculty and staff assignments; [and]

8)   establish and enforce nondiscriminatory guidelines for
     new construction, review of building needs and the
     appropriateness of each proposed building project or
     school closing.

JA 128-30; see also 447 F. Supp. at 1014; see also Evans v.
Buchanan, 582 F.2d at 771-73.

The district court offered more than 180 factual findings in
detailing the school districts' implementation of these ancillary
relief provisions.  In the first four years alone, more than
$18.8 million in federal desegregation project grants were used
to pay for human relations specialists, home-school liaisons,
reading resource teachers and in-service programs.  The state and
the districts maintained these programs even after the transition
to a desegregated system.  And significantly, from 1978 until the
unitary status petition was filed, Appellant never complained to
the court of any failure to comply with any of the ancillary
relief provisions.  Of these eight, the last is undisputed, and
the seventh we have addressed in our discussion on compliance
with the Green factors.  Thus here we will review the district
court's findings on the first six of these ancillary measures.

A. In-Service Training

The district court found that all four districts offered a
rich array of in-service programs for their faculty, and that,
although the focus of these programs no longer is desegregation,
all four districts continue to offer in-service training on

desegregation, race equity and multiculturalism.  Coalition, 901 F. Supp. at 809.  Appellant contends that the district court's findings are clearly erroneous because two of the Appellant's experts testified that the in-service training was inadequate.  Appellant's Br. at 25.  But a reviewing court's role is not to pick and choose isolated snippets of evidence.  Rather, we must decide, after viewing the record as a whole, whether there is evidentiary support for the district court's findings.  Such support is present; accordingly, there is no clear error.

In January 1978, a team from the districts drafted a statement listing several management goals for the in-service training of the faculty, staff and administration.  The first goal -- "[t]o orient the instructional staff to the curricular and instructional process" -- was accomplished through the Center for Conflict and Desegregation at the University of Pittsburgh the following month.  JA 948-49, 4373, 4376-77.  In addition, the team responsible for planning in-service training also realized at least three other goals that year.  Further, in 1978, an Office of In-Service Activities was established and staffed by two full-time personnel, JA 951-52, and all programs relating to desegregation were mandatory for faculty, staff and administrators.  JA 961-62.  Finally, even Appellant's expert testified that the in-service programs offered by the state at the time of desegregation complied with the 1978 order.  JA 1140, 1170.

The record similarly supports the district court's finding that the districts have continued in-service training programs since the 1978 order.  For example, the district court heard evidence that from 1981 through 1994, Brandywine offered various workshops and courses related to desegregation, race equity and multiculturalism.  Moreover, all new Brandywine teachers are required to participate in a 12-hour induction program, which includes a panel discussion on issues of multiculturalism.  JA 931.

Similarly, in the 1980s, various human relations specialists and administrators trained by the Race Desegregation Assistance Center at the University of Pittsburgh worked with the Red Clay faculty and staff in the area of cultural diversity.  DI 1936 at 635-36, 642.  The record further reveals that from 1992 through 1995, Red Clay also has offered in-service training on multiculturalism.  DX 79 at FL 12295, FL 12299, FL 12302, FL 12304-11, FL 12313-14, DX 80; DXC 81; DI 1939 at 1806.  The court's findings with regard to the Christiana and Colonial districts likewise are supported by the record.

In light of the foregoing, we are satisfied that Appellant's charges have no support in the record, and thus that the district court properly found that the schools have met the requirements of in-service training.

### B.  Reading and Communication Skills

The district court found that an affirmative and integrated reading program was instituted in each of the four districts.  Coalition, 901 F. Supp. at 809.  Appellant contends that the

finding is clearly erroneous, because the districts "failed to show that any reading program was implemented for the purpose of remedying the negative effects of the de jure segregation as required by the 1978 Order, or that the reading programs that were implemented did not resegregate students."  Appellant's Br. at 26.  However, although no reading program specifically targeted black students, we conclude from our review of the record that the districts nevertheless met the standard of good faith compliance with the 1978 Order.

The record indicates that a reading program was instituted in the schools in 1978, immediately following the issuance of the remedial order.  JA 967.  The program employed 110 reading teachers, who

> worked with the classroom teacher to help with testing, interpretation of those data from the tests, selection of materials, planning of program and strategies for students who needed assistance and anything that [a] particular teacher wanted, to do to help the students within that classroom.

JA 968.   Students in grades two through nine were provided assistance under the reading program if they were one year or more below reading level, as demonstrated by standardized test scores.  JA 968.  Students in grades ten through twelve were provided assistance if they were two years below level.  Id.  And supplemental reading instruction was provided daily for 30-45 minutes, depending on grade level.  JA 969.  For the most part, this instruction occurred in small groups within the classroom.  Id.  The districts combined have employed between 100 and 135 reading teachers every year since the 1981-82 school year.  JA 4910-11.

Further, the court heard evidence and found facts pertaining to the reading programs in each of the four districts.  With regard to the Red Clay district, for example, the court credited the testimony of officials from the district and found that

> reading resource teachers coordinate the "HOSTS" program (Help One Student to Succeed) for reading- and writing-deficient students.  Under the program, volunteer tutors work with individual children for 45 minutes per week.  More than 300 students participate in the program.
>
> [Twenty five] parent educators hired by the Parents as Teachers program teaches [sic] first-time parents in New Castle County the importance of language and reading for pre-school children.  The program has been in existence since 1987.  In 1993 and 1994, the focus was on teenage parents and families with multiple needs.

Coalition, 901 F. Supp. at 810 (footnote omitted).  The court found similar progress in the other districts.

Because these programs were meant to address the reading problems of every student, Appellant's argument that the program

resegregated students is misguided. Although the school districts have not excluded black (or white) students from the remedial reading programs to effect a racial balance, the districts do deploy several different programs such as one-on-one, small group and pull-out remedial reading programs, in which reading teachers either work inside the classroom or pull a given student out of the classroom for individual attention. Thus we cannot agree that the districts' remedial reading programs have resegregated students; the basic requirement of good faith efforts to remove the vestiges of de jure segregation to the extent practicable have been met. Accordingly, the district court did not clearly err.

Appellant further contends that the school districts have "failed to show that any `communications skills program' was ever implemented" in any of the districts. Appellant's Br. at 26. However, there is no meaningful distinction between reading skills programs and communication skills programs; indeed, the 1978 Order mandates the creation of a singular "program" to teach reading and communication skills. JA 129. Likewise, testimony from school officials on this point suggests that instruction for both skills is combined. Thus "reading skills" and "communications skills" are synonymous for purposes of our analysis here. Accordingly, on the basis of our foregoing discussion of reading skills and programs, we reject Appellant's argument that the districts have not complied with the 1978 Order.

### C. Curriculum

The 1978 Order required that the curriculum "emphasize and reflect the cultural pluralism of the students," and that "all instructional materials, texts and other curriculum aids shall be free of racial bias." JA 129. Appellant argues that the school districts "failed to show that [an] inclusive curriculum as required by the 1978 Order was ever actually taught in a single classroom or that efforts made were anything other than sporadic or shortlived, or that the curriculum achieved any results at all." Appellant's Br. at 27. This sweeping assertion does not comport with the record.

The record indicates that the Delaware Department of Public Instruction has established text selection guidelines for the districts to use in conjunction with their own guidelines to ensure racially unbiased texts and instructional materials. The Department also has adopted a Comprehensive Policy for Multicultural Education, published accompanying guidelines, sponsored multicultural education and adopted multicultural curriculum standards. See, e.g., DX 124 at FL 23147; DX 125 at FL 23172. In April 1994, consistent with these guidelines, the Department sponsored a two-day Multicultural Education Institute. DX 52.

Further, the district court made specific findings that acknowledged efforts in each of the four districts to offer a multicultural curriculum. Coalition, 901 F. Supp. at 810-12. Our review of the record reveals several exemplary programs, including the Brandywine district's extensive black history

curriculum in the elementary schools; Christiana's inclusion of the minority community in the textbook selection process; Colonial's course entitled "Minorities USA"; and Red Clay's integration of cultural pluralism into the social studies, English language arts, art education and music education curriculum guides.

In light of this substantial record evidence supporting the district court's findings, we are satisfied that the court did not clearly err when it found that the schools have complied with the court order as to curricular reform.

## D. Counseling and Guidance

The 1978 Order required the districts to "institute an effective and nondiscriminatory counseling and guidance program . . . [to] insure that students are counseled on a racially nondiscriminatory basis" concerning post-secondary opportunities. JA 129. Appellant argues that the districts "failed to show that any effort had been made to ensure that the counseling and guidance programs attempted to prevent resegregation of students in the classroom as required by the 1978 Order or that, in fact, the counseling and guidance programs did not become vehicles for resegregation. The School System failed to show that the counseling and guidance programs achieved any results at all." Appellant's Br. at 26. Again, the record belies Appellant's bold assertions.

In the spring of 1978, the New Castle district formed a committee "to follow the directive of the Court at the time [--] to develop a nondiscriminatory developmental guidance program for all students." JA 770. The committee drafted guidelines, which the district adopted in the Handbook for Certified Guidance Counselors. JA 770-71. In 1981, the Department modified the guidelines for district and statewide use in the Delaware Guidance Handbook, K-12, which was itself revised in 1990 as Appendix B to the Handbook for K-12 Education. JA 770-71.

The record further establishes that, from 1981 to 1991, these Department guidelines governed counseling programs within the districts. For example, in 1990, the state directed each district to prepare "a written plan describing the guidance program for the district which is reviewed periodically and updated at least every five years." DX 230 at D 1464. Plans for each district subsequently were drafted and approved. JA 755, 769-70, 852, 864, DX 230, DX 231, DX 232, DX 233, DX 234. The district programs described in the plans include academic, personal, social, career and life-planning counseling. JA 1137.

The court's detailed description of the programs established in each of the districts also is supported by the record. Coalition, 901 F. Supp. at 813-814. Especially mindful of alleged disparities in the Red Clay school district, we emphasize that the record clearly supports the district court's determination that that district administers aptitude tests, provides speakers, supplies ample resource material, offers participation in various achievement programs, and facilitates an extensive college visitation program. JA 772-74.

In sum, it is clear that the State Board has adopted

nondiscriminatory counseling guidelines; that all the districts have provided comprehensive post-secondary career, educational and vocational assistance; and that the districts support numerous supplementary counseling programs which encourage minorities to pursue post-secondary education. Moreover, Appellant fails to cite any instance of discriminatory counseling. Accordingly, we conclude that the court did not err in determining that this aspect of the remedial order was fulfilled.

### E. Human Relations

The 1978 Order required the districts to "provide an appropriate human relations program" for "schools undergoing desegregation." JA 130. The provision was intended to be transitional, designed to address "the various pressures which arise as a result of desegregation." Evans, 582 F.2d at 769. Appellant argues that "[t]he School System failed to show that any human relations program was actually implemented as written . . . or that any human relations program lasted for more than a brief duration or achieved any results at all." Appellant's Br. at 24-25. Nevertheless, the record supports the district court's findings.

The school districts responded to the order by implementing a program involving more than 100 specially trained and certified specialists who were assigned to schools in "biracial teams." JA 763-64. Each high school and junior high school had at least one team, and these teams were also directed to serve a number of elementary schools. Id. These specialists provided crisis intervention assistance and implemented student support programs, such as peer tutoring and counseling. JA 764-66. Because the desegregation went smoothly, the focus of the program soon shifted to multicultural awareness, problem-solving and other student support functions. JA 764. The districts continued these services by retaining human relations personnel and hiring elementary guidance counselors, social workers, community outreach personnel, visiting teachers, student advisors, student relations specialists and other student support personnel. See Coalition, 901 F. Supp. at 815-16.

Moreover, the district court described in detail the progress in each of the four districts. Again directing our focus to the Red Clay district, we note that "Red Clay employed 16 human relations specialists and home/school advisors in 1981-82 and 18 in 1982-83" and "five human relations specialists and home/school advisors" as recently as 1993-94. Coalition, 901 F. Supp. at 816 (crediting Defendant's Exhibit 111).

Notwithstanding the necessary (and welcome) shift in the focus of the human relations program, it clearly has lasted beyond "a brief duration" and has yielded significant results. Accordingly, these findings support the district court's determination that the school districts complied with the court order as to human relations programs.

### F. Discipline

The 1978 Order required the development of a code to provide

"racially nondiscriminatory discipline" and to ensure "procedural and substantive due process."  JA 130.  In July 1978, the New Castle district adopted a code of conduct drafted by a "committee [which had] gathered similar documents from Delaware and large desegregated school districts for review."  JA 4436.  Prior to adoption, drafts of the code were reviewed by citizen groups, student council leaders, the Teachers' Association, and administrators.  JA 4435-36.  The districts adopted the New Castle code in 1981, and each district has revised the code periodically since then, through a "process of development and continual revision that includes [the] involvement of others, that includes teachers, includes administrators, and there are processes for the codes to be reviewed by external sources and have input."  JA 719.

Appellant's discipline expert concedes that the districts' codes are not "discriminatory on their face."  JA 1157.  And the district court found that the codes "are not applied in a discriminatory fashion."  Coalition, 901 F. Supp. at 817.  Appellant argues, however, that the school districts have failed to reduce racial disparities in discipline rates among students, and that Appellant was denied the opportunity to admit expert testimony in support of this claim.  However, on this matter the record supports the district court's findings, as well as its exercise of discretion.

The district court's finding that discipline is not administered in a discriminatory fashion is supported by the testimony of Dr. Charles Achilles, the school districts' expert.  Dr. Achilles calculated indices by dividing the percentage of black student suspensions by the black enrollment percentage.  Based on these data, Dr. Achilles determined that the districts' suspension indices reflected less racial imbalance than indices calculated from national suspension data compiled by the Office of Civil Rights and Delaware arrest data.  JA 722-23.  Dr. Achilles further illustrated that the indices were essentially consistent across the four districts -- "a result difficult to achieve if equitable nondiscriminatory codes were not being used and applied in an equitable, nondiscriminatory manner."  Coalition, 901 F. Supp. at 817; see JA 724.  And finally, Dr. Achilles demonstrated "consistency in how the codes were applied by administrators, regardless of the administrators' race."  Coalition, 901 F. Supp. at 817; see JA 725.  In light of this compelling testimony, we conclude that the district court did not clearly err in determining that, as to discipline, the school districts have complied with the 1978 Order.  See Krasnov, 465 F.2d at 1302 (standard of review).

Nor did the district court err in rejecting the testimony of Appellant's discipline expert, Dr. William Gordon.  He could cite no study or authoritative literature to support his assumption "that 'undiscipline' or misbehavior is a randomly distributed characteristic among racial groups . . . ."  JA 1161.  And in fact, statistical data demonstrate a comparable or greater racial disproportion for those offenses for which Delaware law mandates suspension, which Gordon called "very objective" offenses, than for those offenses he viewed as less objective.  JA 726.

Accordingly, we reject Appellant's argument that the schools have failed to reduce racial disparities in discipline rates.

We likewise reject Appellant's contention that expert testimony on this matter was improperly rejected by the district court. A trial judge's exclusion of testimony cannot be disturbed on appeal "absent a clear abuse of discretion." Semper v. Santos, 845 F.2d 1233, 1238 (3d Cir. 1988); Fashauer v. New Jersey Transit Rail Operations, 57 F.3d 1269, 1287 (3d Cir. 1995). In both Semper and Fashauer, the court upheld the exclusion of rebuttal testimony because of counsel's failure to adhere to a pretrial order. Semper, 845 F.2d at 1238; Fashauer, 57 F.3d at 1287.

Here, Appellant disregarded two pretrial orders requiring the disclosure of the "specific subject matter as to which each expert will testify" and the provision of expert reports complying with Rule 26, Federal Rules of Civil Procedure. Denying Appellant's motion to delay disclosure of the identity of its experts, the district court stressed, more than three months before trial, that "[t]his is a case where the interests of justice dictate public disclosure of the parties' experts and early resolution of any potential disputes regarding any experts' qualifications." JA 203, 208.

Rule 26 states that "[t]he report shall contain a complete statement of all opinions to be expressed and the basis and reasons therefor" and obligates a party to supplement the report if it "learns that in some material respect the information disclosed is incomplete or incorrect . . . ." Fed. R. Civ. P. 26(a)(2)(B) & (e)(1). Supplementation must be made "with special promptness as the trial date approaches." Fed. R. Civ. P. 26(e). Exclusion of testimony is an appropriate sanction for failure to supplement in a timely manner. See Freund v. Fleetwood Enterprises, Inc., 956 F.2d 354, 358 (1st Cir. 1992).

As of November 30, Appellant knew all of the State Board's experts' topics and methodologies. Appellant could have, but declined to, file a supplemental report for expert witness de Leeuw on December 9, as it did for three of its other experts. Appellant also could have disclosed its intent as a result of counsel's comments at the deposition on December 15. Instead, Appellant chose the tactical route of surprise. In light of the foregoing discussion, we conclude that the district court did not abuse its discretion in excluding this surprise testimony.

### VII. Areas of Concern to the District Court and Allocations of the Burden of Proof

Aside from its examination of the four school districts' compliance with the Green factors and the ancillary relief measures, the district court also acknowledged that certain performance disparities persist in the New Castle County schools -- most notably in the Red Clay district. These performance disparities include student achievement, special education, and dropout rates, and are not disputed here. However, because these disparities are not among the vestiges

enumerated either in Green or in the ancillary relief order, we must determine, first, whether these disparities actually are vestiges of de jure segregation, and if so, whether the school districts have in good faith eliminated them to the extent practicable. Having considered the taxonomy of disparities proffered by Appellant and reviewed the record and pertinent legal precepts, we hold that Appellant properly was allocated the burden to prove that the disparities were vestiges, and that the Appellant failed to meet this burden.

The Court has made plain that certain disparities necessarily are vestiges of de jure segregation. Identifying what would become known as the Green factors, the Court directed school boards to propose plans designed to disestablish state-imposed segregation in "every facet of school operations -- faculty, staff, transportation, extracurricular activities and facilities." Green, 391 U.S. at 435. Accordingly, and as the relevant cases cited by Appellant demonstrate, the Court consistently has turned to the Green factors to "determin[e] whether a dual school system has been disestablished." Columbus, 443 U.S. at 458-61 (Green factors). See also Davis v. Board of Sch. Comm'rs of Mobile County, 402 U.S. 33, 37 (1971) (pupil assignment); Dayton Bd. of Educ. v. Brinkman, 443 U.S. at 538 (pupil assignment and school construction). Indeed, the Greenfactors have become per se vestiges of de jure segregation -- and therefore the focal point for determining unitary status. Nevertheless, the performance disparities enumerated by Appellant are not among these factors.

Still, the Green factors are not the only disparities that may be classified as vestiges of de jure segregation. Depending on the circumstances of a particular case, the trial court still may exercise discretion to consider other factors. Freeman, 503 U.S. at 492-93. The circumstances of the instant case prompted the district court, in 1978, to order eight ancillary remedial measures. As with the Green factors, we have reviewed the districts' compliance with that order and conclude that there was a good faith effort to eliminate the vestiges identified therein to the extent practicable. Again, however, the performance disparities urged here were not identified among these vestiges of de jure segregation.

We emphasize that here we are not discussing the burden of proving compliance with the Green factors or the 1978 Order, as to which the school districts acknowledge bearing the evidentiary burden. Our discussion here, and our allocation of the burden of proof to Appellant, is limited to the issue of proving that the identified performance disparities are vestiges of de jure segregation.

Because the performance disparities claimed by Appellant are not among (or even similar to) the Green factors or the vestiges identified in the 1978 Order, we will not simply presume -- as Appellant urges us to do -- that these are vestiges of de jure segregation. Appellant offers no persuasive authority for establishing a causal link between present achievement disparities and past de jure segregation. In fact, all but one of the cases relied on by Appellant on this point are irrelevant,

because they address only Green-type factors; the State Board does not dispute that it carried the burden of proving good faith efforts to eliminate (to the extent practicable) such vestiges of de jure segregation.

Appellant thus can rely solely on Vaughns by Vaughns v. Bd. of Educ. of Prince George's County, 758 F.2d 983, 990-91 (4th Cir. 1985), which, upon our review, supports the district court. In Vaughns, because the school district was not unitary with respect to the Green factor of student assignment, id. at 990-91, the Court of Appeals for the Fourth Circuit held that the plaintiffs were entitled to a presumption that disparities in special education and gifted and talented programs arose from prior segregation. More important, the Vaughns court distinguished a decision from a sister circuit because "the burden shifted to [Appellants] in that case only because the school system had achieved unitary status with regard to student assignment." Vaughns, 758 F.2d at 991.

Here, however, the districts have been unitary as to school assignments since the 1978 order. Had the Vaughns school district satisfied the Green factors as have the Delaware districts before us, the Vaughns plaintiffs would have had to prove that performance disparities resulted from de juresegregation. The Court of Appeals for the Fourth Circuit so held in two subsequent cases. See Riddick by Riddick v. School Bd. of City of Norfolk, 784 F.2d 521, 534 (4th Cir.), cert. denied, 479 U.S. 938 (1986); School Bd. of the City of Richmond, Va. v. Baliles, 829 F.2d 1308, 1312 (4th Cir. 1987). The same result should obtain here.

Further, we must respect the Court's teaching that "a school board is entitled to a rather precise statement of its obligations under a desegregation decree" and to "a like statement from the court" for when "such a decree is to be terminated or dissolved." Dowell, 498 U.S. at 246 (citing Pasadena City Bd. of Educ. v. Spangler, 427 U.S. 424 (1976)). Because we are reluctant to impose any unstated obligation on the school boards, we allocate the burden to prove any additional violation to the Appellant. See Jenkins, 115 S. Ct. at 2055-56 (to require a remedy, inferior student achievement must be proven to have resulted from de jure segregation); see also Keyes v. School Dist. No. 1, C.A. Nos. C-1499, 69-M-1499 (D. Colo. Sept. 12, 1995), slip op. at 14 ("The Court's opinion in . . . Jenkins. . . defeats the plaintiffs' call for compelling additional action to investigate and redress racial disparities in student achievement . . . [when the] court has never made any findings that such differences are the result of discrimination by the District").

In light of the foregoing discussion, we conclude that Appellant failed to carry its burden. The district court's finding that persistent student performance disparities were caused by socioeconomic factors is supported by the record. Coalition, 901 F. Supp. at 818-19. The district court cited various demographic data from the 1990 U.S. Census and the 1992 Vital Statistics Report of Delaware that illustrate a "black/white gap" in the geographic area contained in the four

school districts, and in New Castle County generally, as to socioeconomic conditions. The record establishes that "Blacks in the desegregation area are in an inferior position economically to whites, and [that] that gap is wider in New Castle County than it is in the nation as a whole." Coalition, 901 F. Supp. at 818.

Further, the record supports a causal link between these socioeconomic factors and student achievement across the four districts: "There is consistency between the gap in socioeconomic status with the gap in achievement, with Brandywine statistics demonstrating the greatest disparity in both areas, Colonial the least disparity." Id. With such support in the record, these findings cannot be clearly erroneous. Anchoring its determination on these unfortunate, but uncontroverted, socioeconomic factors, the court found, inter alia, that "[b]ecause the environment outside school is so strong, cumulative, and varied, schools cannot overcome such environmental/differences [sic] among children." Id. at 819. We agree.

Accordingly, we affirm the district court's allocation of the burden of proof and its determination that persistent performance disparities are not vestiges of de jure segregation.

## VIII. Conclusion

The task of setting forth reasons for affirming the district court's judgment would have been lightened considerably -- and this opinion made benevolently more brief -- had the Coalition not chosen to mount a scatter-gun attack on virtually every aspect of the district court's comprehensive opinion. Indeed, the Coalition portrays nearly 20 years of federal court supervision of Delaware public education as a cheerless and sorrowful failure. As our discussion has shown, however, the Coalition's contentions, in the main, have been expressed in conclusory language that neglects to demonstrate where the district court erred and fails to appreciate the narrow standard of review by which we are constrained.

Moreover, the Coalition repeatedly has failed properly to acknowledge the importance of pervasive socioeconomic conditions that account for discrepancies among the races in educational performance. Indeed, the Coalition avoids the responsibility of carefully examining the roots of the continuing black/white achievement gap, a brutal national phenomenon first documented in the 1960s and substantiated in various recent studies that "demonstrate that if socioeconomic characteristics are more equalized, achievement levels are more equalized." Coalition, 901 F. Supp. at 819. These studies conclude that "[i]t is difficult for children to take equal advantage of learning opportunities absent the initial and cumulative advantages of a stimulating home curriculum," and that "[b]ecause the environment outside school is so strong, cumulative, and varied, schools cannot overcome such environmental/differences among children." Id.

These conclusions support our belief, presented in the foregoing discussion, that none of the Coalition's arguments

concerning special education, discipline and dropout rates, student achievement, extra-curricular activities or disparities in college matriculation can seriously be considered without weighing the impact of critical demographic data. This the Coalition has failed to do, choosing instead to focus its primary energies on arguing for continued federal court supervision of the schools -- as if a federal judge's order could eliminate, with the stroke of a pen, broad social problems.

As humans, we acknowledge with melancholy the fact that many socioeconomic factors militate against a completely level playing field in our society. As judges, however, we are powerless to alter formidable social, economic and demographic forces and conditions over which no legal precept has control. Moreover, we are constrained to fulfill an obligation to address only those constitutional questions properly presented to us, and to show fealty to appropriate standards of review, lest we abandon the limits on judicial power that give coherence to our political system. The district court articulated the meaning of these institutional limits for this case:

> [t]he continued existence of racial discrimination in our society as a whole, and the effect of that discrimination on the ability of a black child to enter school on an equal footing with more privileged white schoolmates, are not matters in dispute in this litigation.

Coalition, 901 F. Supp. at 823. Unfortunately, in its presentation the Coalition repeatedly has refused to accept the fundamental concept that this court's scope of review is limited to determining whether the district court clearly erred in concluding that the school districts have achieved unitary status.

The history of our jurisprudence contains no true precedent for the micromanagement of school systems by the federal courts. Indeed, our authority to supervise these school districts does not stem from the Anglo-American common law tradition, in which the law evolves through judicial reasoning based on legal principle; instead, our legitimacy here derives exclusively from the powers that inhere in equity jurisdiction, "another stream that flowed alongside the common law, whose headwaters were in the discretionary royal prerogative. Equity was a more flexible process, more unprincipled, initially quite ad hoc." Thus the jurisprudential basis for 20 years of detailed management of the Northern New Castle County school system has been, simply, a remedy framed in equity to enforce a desegregation decree.

This equitable remedy and, by definition, its jurisprudential legitimacy, were meant to have a limited lifespan. The remedy was designed to serve only as an implement for monitoring and guidance, not as a permanent substitute for state and local school boards, or indeed, for the state legislature. Thus in our zeal to insure maximum educational opportunities for all Delaware school students, the federal courts must bear in mind that the responsibility for

administering the schools ultimately belongs to locally elected officials.  Indeed, we must acknowledge that although it has been proper for us to supervise multiple generations of students in the service of unassailable ideals, in the process we have also denied multiple generations of elected officials the freedom to participate fully in representative government.  For 20 years there has been a constant colloquy between federal judges and officers of these political institutions, a score of years in which to achieve desegregation "with all deliberate speed," as ordered in Brown II, 349 U.S. 294, 301 (1955).

In ruling that the school districts of Northern New Castle County have at long last truly respected our specific orders of desegregation, the district court has cut the umbilical cord extending from the courtroom to the classroom.  Institutions that normally are free to exercise powers traditionally granted them (and them alone) in the American political process now are free to assume those powers.  The time has come for the courts to step back.  What Roscoe Pound said almost a century ago still is most appropriate: "[W]hen men demand too much of law, when they seek to devolve upon it the whole burden of social control, when they seek to make it do the work of the [school,] home and . . . church, enforcement of law comes to involve many difficulties."

The judgment of the district court declaring unitary status will be affirmed.

Coalition to Save our Children v. State Board of Education of the State of Delaware et al., No. 95-7452

---

SAROKIN, J., dissenting:

One hundred years ago, the United States Supreme Court turned its back on the constitutional promise of equal protection of the law that this country made to its African-American citizens in the aftermath of the Civil War.  In Plessy v. Ferguson, 163 U.S. 537 (1896), the Court upheld the constitutionality of laws requiring the racial segregation of public facilities, including public schools, as "within the competency of the state legislatures," id. at 544, and validated the infamous doctrine of "separate but equal."  See id. at 552 (Harlan, J., dissenting).

No one at the time could have truly believed for one instant that there was a shred of equality between the systems serving the white children and black children of the dual school systems.  Yet it took close to sixty years for the Supreme Court to acknowledge the reality of segregation.  In one of the most glorious moments of the history of the federal judiciary, the Court, speaking in a unanimous voice, effectively repealed the "separate but equal" doctrine by holding, in Brown v. Board of Education, 347 U.S. 483, 495 (1954), that "in the field of public education the doctrine of 'separate but equal' has no place."

Along with Topeka, Kansas, the Supreme Court in Brownwas considering the fates of three additional school systems: South Carolina, Virginia, and Delaware.  Delaware became a part of this historic decision after the state's Supreme Court ordered two districts to admit black children into de jure all-white

schools.  Gebhart v. Belton, 91 A.2d 137 (Del. 1952).  It was the appeal from that decision that was consolidated with the Topeka case.

There was no straight and unwavering march toward a color-blind school system in the aftermath of Brown, however.  Rather, desegregation in Delaware and elsewhere has had a "long, tortured history," Evans v. Buchanan, 447 F. Supp. 982, 1000 (D. Del.), aff'd, 582 F.2d 750 (3d Cir. 1978), cert. denied, 446 U.S. 923 (1980).  Resistance to the mandate of Brown was fierce, and at times violent.  Then-Governor George Wallace of Alabama spoke for many when, standing on the front steps of the University of Alabama in Tuscaloosa, he denounced the "illegal usurpation of [state] power by the Central Government" and tried to block admission of African-American youngsters into the state university system.

Delaware officials, as well, proved less than responsive to the constitutional mandate to desegregate the state's public schools and, as a result, the federal courts were compelled to enforce the mandate one ruling at a time, culminating with this Court's desegregation order in 1978.  Evans v. Buchanan, 582 F.2d 750 (3d Cir. 1978) (in banc), cert. denied, 446 U.S. 923 (1980).  Today we are asked to lift this order.

The Majority accurately reflects the tortured history of this matter.  The elapse of four decades of litigation and court supervision clearly militates against its continuance, but it is also evidence of begrudging compliance with repeated court orders to desegregate.  I find it ironic that the delay in implementing the orders of this court to end segregation is now being utilized to justify the end of court intervention.  Although it is very tempting to end judicial supervision in the face of substantial progress, it would be unfortunate to abandon it just short of success.  I dissent, not because I conclude that any of the findings of the district court are erroneous, but rather because accepting them causes me to conclude that some vestiges of past discrimination may remain, although I concede that many have been eliminated.

I concur with the majority's recognition of the need to return control of schools to local communities, but only if and when we are satisfied that the goals established some 18 years ago have been substantially met.  I challenge the majority's suggestion that the court's role in these matters has "denied multiple generations of elected officials the freedom to participate fully in representative government."  Majority at 68.  The denial of that participation, if it occurred, was not due to judicial usurpation but rather arose from the discriminatory and unconstitutional conduct of many of those elected officials.  It is not the courts who have delayed the return to local power, but it is those elected officials who failed to act "with all deliberate speed."  Brown v. Board of Education [Brown II], 349 U.S. 294, 301 (1955).  Even if we are to withdraw our supervision at this juncture, I see little need to apologize for the court's intervention in these matters.  Without such intervention our schools would have remained separate and unequal and a segment of our nation would have been

denied rights and opportunities to which all are entitled.

## I.  Shared principles

Before I articulate the reasons for my dissent, I want to underscore the shared premises under which the majority and I operate.

There is, first of all, no disagreement that "to extend federal court supervision indefinitely is neither practicable, desirable, nor proper," Majority at 16, and this is not what I advocate today.  At the same time, the Supreme Court has held that supervision by the courts should continue until "the vestiges of past discrimination ha[ve] been eliminated to the extent practicable."  Freeman v. Pitts, 503 U.S. 467, 492 (1992).  Because the Appellees have not met this requirement, I believe that withdrawal of supervision is premature at this point.

Nor is there any disagreement between the Majority and the Dissent that "[t]he proper test under the Constitution is equality of opportunity, not of results."  Majority at 31.  To the extent that the principal issue in this Dissent is the placement of African-American children in lower-level classes, and to the extent that the district court itself found that "lower levels of instruction may not encourage achievement and may adversely affect the ability of a student to attend college," Coalition to Save our Children v. State Bd. of Educ., 901 F. Supp. 784, 801,   49 (D. Del. 1995), it is their opportunity to succeed academically that is at stake.

Finally, I share the Majority's "reluctan[ce] to impose any unstated obligation on the school boards."  Majority at 61.  At the same time, we should not impose or tolerate any limitations on the opportunity of young black students to participate equally in the educational process and derive all of the benefits therefrom.

## II.  Factual findings

I now turn to the substantive review of the district court's ruling.  First, I agree with the Majority's conclusion that the vestiges of segregation have been eliminated with respect to the following areas: intra-district student racial balance, Majority at 18-20; special education student assignment, id. at 21-24; faculty and clerical staff assignment, id. at 32-36; extracurricular activities, id. at 37-38; transportation, id.at 39; facilities, id.; in-service training, id. at 41-44; reading skills, id. at 44-47; curriculum, id. at 48-50; counseling and guidance, id. at 50-52; human relations, id. at 52-53; and discipline, id. at 53-57.

However, I cannot agree with the Majority that the Appellees demonstrated, or that the district court correctly concluded, that the vestiges of segregation have been eliminated with respect to the following facets of school operations: student classroom assignment; certified staff assignment; and communications skills programs.  I therefore would remand to the district court for further findings regarding these three areas. In addition, because classroom assignment affects student achievement, I would remand for further findings regarding the

so-called "areas of concern."  Finally, because the district court did not apply the correct legal standard regarding the exclusion of the testimony of one of the Coalition's experts, I would remand for further findings on this issue as well.

                    A. Student classroom assignment

I note, first of all, that "the school districts acknowledge bearing the evidentiary burden" of proving compliance with this issue, other Green factors and the 1978 Order.  SeeMajority at 59.

            1. The district court's findings and conclusions

Findings 30 to 49 of the district court's opinion concern student classroom assignments.  Coalition, 901 F. Supp. at 799-401.  Findings 34 through 49 focus more specifically on "tracking" or "ability grouping," i.e., the assignment of students "to various instructional groups on the basis of ability."  Id. at 800-01.  Among the court's findings are the following:

> 36. The extent to which elementary and middle school students are placed in classes according to their ability is unclear from the record.

                              * * *

> 38. In 1993, the percentage of minorities in the self-contained honors and gifted student program at Burnett Elementary School [the only self-contained "gifted" student program in the 4 districts, id. at 800 n. 27], who scored above 85% on exams is slightly greater than that for the other groups.

                              * * *

> 46. A review of the percentages of the racial groups who were taking college and non-college prep classes illustrates that: a) a little over 50% of Brandywine's black students in grades 9-12 were taking non-college prep English, whereas a little less than 20% of Brandywine's white students were taking that level of English; b) a little over 60% of Christiana's black students in grades 9-12 were taking non-college prep English, whereas a little less than 25% of Christiana's white students were taking that level of English; c) a little over 50% of Colonial's black students in grades 9-12 were taking non-college prep English, whereas a little less than 35% of Colonial's white students were taking that level of English; d) a little over 40% of Red Clay's black students in grades 9-12 were taking non-

college prep English, whereas a little less than 17% of Red Clay's white students were taking that level of English. Less than 5% of black students were enrolled in advanced English in the high schools of the 4 districts; however, over 20% of white students were at that level.

47. There is evidence that among high school students who achieve identical testing scores ["The comparison apparently does not include academic achievement as measured by course performance, or whether such placement was requested or required." Id. at 801 n.30.], black students were more likely to be placed in the lower level class than were white students.

48. On the other hand, the percentage of minorities enrolled in honors and AP classes who scored over the 75th percentile in reading or math in the spring of 1993 is slightly greater than that of whites in all 4 school districts.

49. There is evidence that lower levels of instruction may not encourage achievement and may adversely affect the ability of a student to attend college.

Id. at 800-01 (citations omitted).

Taken together, these findings demonstrate that: (1) African-American students are less likely to be assigned to high-level classes than their white counterparts, and more likely to be placed in low-level classes [ 46]; and (2) these disparate assignments are made at least in part for reasons other than academic merit, since black students who perform as well as white students are "more likely to be placed on the lower level class than [are] white students" [ 47; see also 38, 48]. In the absence of alternative explanations, these findings permit the inference that the four districts' tracking practices may be based, at least in part, on racial considerations. Furthermore, the court's findings demonstrate that these disparate tracking assignments may deprive African-American students of the opportunity to achieve the same level of academic success, including college admission, as their white counterparts [ 49].

The district court made no additional finding of fact regarding alternate explanations for these "potentially troubling" findings, see Majority at 24. Furthermore, whereas it was able to conclude, with regard to school-based student assignments, that "[t]he 4 districts are among the most racially balanced schools in the United States," see Coalition, 901 F. Supp. at 799, 29, it reached no such conclusion regarding tracking-based assignments.

The court did conclude as a legal matter that "there is no credible evidence linking any current racially identifiable conditions to the prior violation," id. at 823, and that "the vestiges of past discrimination have been eliminated to the extent practicable." Id. at 823-24. I believe that the evidence discussed supra does not support this conclusion.

First of all, the court's own findings constitute "credible evidence" potentially linking one racially identifiable condition -- i.e., the racial disparities in assignment to high-level and low-level classes -- to "the prior violation."

Second, while the findings regarding student tracking do not prove conclusively that the school districts discriminate in their tracking practices on the basis of race, they certainly do not support the opposite conclusion -- i.e., that the districts do not discriminate on the basis of race. If anything, the court's findings create a presumption that race might be a factor in New Castle County's tracking practices. Since the burden with regard to the Green factors -- including student assignments -- is on the Appellees to prove that the vestiges of segregation have been eliminated, and since the Appellees offered no explanation for the disparities in tracking, the uncertainty as to the cause of the disparities should be resolved in favor of the Coalition, and therefore the district court's conclusion that the vestiges have been eliminated, at least with regards to student classroom assignment, was unsupported and premature.

2. The Majority's analysis

Despite the disparity between the court's own findings of fact and its conclusions of law, the Majority affirms the court's conclusion. I believe that the Majority's position is based on the wrong standard of review, the wrong allocation of burdens and an unsustainable reading of the evidentiary record.

(a)

First, the Majority defines "our task" as "to inquire whether the district court's determination of the districts' unitary status was clearly erroneous." Majority at 26. The district court's determination as to unitary status, however, is one not of fact, which we would review for clear error, but of law, see Coalition, 901 F. Supp. at 822-23, which as is customary we subject to plenary review.

(b)

Second, time and again the Majority dismisses the import of the district court's factual findings by resolving gaps in the evidentiary record and ambiguities as to those factual findings in favor of the Appellees, despite the fact that by its own acknowledgment, and that of Appellees, Appellees bear the burden of showing that the vestiges of discrimination have been eliminated.

(i) The Majority dismisses the district court's finding that "among high school students who achieve identical testing scores, black students were more likely to be placed in the lower level class than were white students," Coalition, 901 F. Supp. at 801, 47, as "no[] . . . evidence that black students have not received equal opportunity." Majority at 25. While the Majority concedes that this "potentially troubling" finding might

"suggest[] on its face that black students may have been segregated from white students of equal testing aptitude," id. at 24, it rejects this conclusion on the ground that the comparison did not "consider[] as well the important factor of academic achievement based on course performance," and that "it is not clear whether the placement at issue was requested or required." Id. at 25.

Of course, the evidentiary gaps that the Majority identifies do not nullify the import of the district court's finding as to potential disparate treatment of equally qualified students based on race. Furthermore, these gaps should not serve to exonerate the party that bears the burden of proof; uncertainty as to the significance of the district court's factual finding should not be resolved in favor of the party that bears the burden.

(ii) The Majority dismisses the district court's finding that "the percentage of minorities enrolled in honors and AP classes who scored over the 75th percentile in reading or math in the spring of 1993 is slightly greater than that of whites in all 4 school districts," Coalition, 901 F. Supp. at 801, 48, as "so limited, and thus malleable, a sample," Majority at 25, as to allow any number of inferences. Specifically, while the Majority acknowledges that "this finding could . . . give rise to an inference that blacks must perform at a higher level than whites in order to be placed in honors and AP classes," it suggests that "we may just as reasonably infer something quite different: that the school districts' good faith efforts to desegregate have paid off in terms of the improved testing performance of black students." Id. at 25–26.

The Majority's inference, even assuming that it is one an appellate court could draw, is unconvincing at best: the issue is not whether some black students perform well, but rather whether black students must perform better than whites to be placed in honors and AP classes, which the district court's finding clearly suggests. In any case, once again it is inappropriate -- and legally erroneous -- to dismiss the Coalition's interpretation because another interpretation, more favorable to Appellees, is possible when the burden lies with Appellees.

(iii) The Majority dismisses the district court's finding that "[t]he extent to which elementary and middle school students are placed in classes according to their ability is unclear from the record," Coalition, 901 F. Supp. at 800, 36, as "mean[ing] little on its own, for it represents merely that there is uncertainty in the record about how elementary and middle school students are placed in classes according to their ability." Majority at 26.

True enough. However, uncertainty about student placement merely demonstrates that Appellees have failed to meet their burden of showing that the vestiges of discrimination have been eliminated. To suggest otherwise is to misallocate the evidentiary burden.

(iv) The Majority dismisses the district court's finding of "[e]vidence that lower levels of instruction may not

encourage achievement and may adversely affect the ability of a student to attend college," Coalition, 901 F. Supp. at 801, ¶ 49, as "not establish[ing] anything specific about whether that putative problem is related to disparate educational opportunity or treatment according to race." Majority at 29.

The significance of this finding, however, is not to demonstrate that black students are channeled to lower-level classes, but that if they are, this would have a deleterious effect on their level of academic achievement. This finding, when read in the context of the district court's other findings suggesting that students are assigned to different levels of instruction based on race, is ominous and suggests that the poor performance of black students in a number of areas might not be related solely to socioeconomic factors.

(c)

At the end of its analysis, the Majority proclaims that "[a]s we already have made clear, [the basis on which students are placed in lower levels of instruction] was not racially discriminatory." Majority at 29. In fact, neither the district court's findings nor even the Majority's analysis supports such a conclusion. At best, they suggest that the record is indeterminate regarding whether students are assigned to certain levels of instruction on the basis of race -- i.e., that Appellees have failed to establish that in the area of student assignment, the vestiges of discrimination have been eliminated to the extent practicable.

### 3. Conclusion

For the foregoing reasons, I would remand to the district court for further findings regarding the racial disparities in tracking.

### B. Certified staff

Regarding the issue of staff assignment, the district court noted that "[t]he staff is divided into three subsections: administrative staff, certified staff, and classified staff." Coalition, 901 F. Supp. at 802, ¶ 50. As the court explained, "'[c]ertified staff' includes nonadministrative certified personnel such as teachers, psychologists, speech and hearing therapists, educational diagnosticians and other 'instructional and pupil support personnel.'" Id., ¶ 52.

Except for teachers, the court made no finding regarding the racial identifiability of the schools with respect to the certified staff. Similarly, the Majority discusses the districts' efforts regarding the faculties, Majority at 33-35, and the "non-professional" or "classified" staff only, id. at 35-36, but in no way discusses the districts' efforts regarding certified staff.

No one disputes that these professionals were included in the 1978 Order, and I see no reason for the district court's omission. Therefore, I would remand to the court for further findings regarding whether vestiges with regard to certified staff have been eliminated.

### C. Communication skills

The 1978 Order required the districts (which at the time were consolidated into a single district) "to institute an

affirmative reading and communication skills program which does not resegregate pupils." Evans, 447 F. Supp. at 1015–16. I do not dispute the Majority's conclusion that "the districts . . . met the standard of good faith compliance with" the Order regarding reading skills. See Majority at 45. However, the district court made not a single finding regarding the implementation of a communication skills program. See Coalition, 901 F. Supp. at 809–10,    168–185.

The Majority contends that this oversight is inconsequential because "there is no meaningful distinction between reading skills programs and communication skills programs," Majority at 47, and that "'reading skills' and 'communications skills' are synonymous for purposes of our analysis here." Id. at 48. However, there is no support in the record to read the "communication skills" requirement as mere surplusage. I cannot agree with the Majority's suggestion, eighteen years after the fact, that the language of the 1978 Order was merely sloppy or redundant. This suggestion is not only in contradiction with the careful analysis of the district court at the time, but also with the plain meaning of the words. Reading and communication are different forms of human activity, and they involve different skills. Therefore, I would remand to the district court for further findings in this area.

### D. Areas of concern

In addition to the so-called Green factors and the ancillary relief measures outlined by the district court in 1978, the district court considered several "areas of concern" for possible discriminatory practices: student achievement; special education; and dropout rates. Coalition, 901 F. Supp. at 818–22. As the Majority acknowledges, there is no dispute that significant disparities along racial lines remain in these various areas. See Majority at 57. The issue is whether these disparities are legally cognizable vestiges of de juresegregation. The district court concluded that "[t]here is no credible evidence demonstrating that the differences between black and white children's success in school can be attributed to the former de jure segregated school system." Coalition, 901 F. Supp. at 823.

In a very real sense, there can be no doubt that the condition of many African–Americans in our society is a lasting legacy of a time when people of color as a matter of law were denied equality of opportunity. However, the Supreme Court has made it clear that not all vestiges of de jure segregation are "the concern of the law," but only those that "have a causal link to the de jure violation being remedied." Freeman v. Pitts, 503 U.S. 467, 496 (1992).

With regard to the Green factors, causality is presumed. As the Majority explains, "the Green factors have become per se vestiges of de jure segregation." Majority at 58. Causality is also presumed for the ancillary relief measures contained in the 1978 Order. But the issue of establishing causality is a more difficult one in the case of the identified performance disparities.

I agree with the Majority that under the typical

scenario, "[b]ecause the performance disparities claimed by Appellant are not among (or even similar to) the Green factors or the vestiges identified in the 1978 Order, we will not simply presume . . . that these are vestiges of de jure segregation." Majority at 59. I also agree with the Majority, however, that if the district court ultimately were to find that the school district has not achieved unitary status, the burden would shift and the plaintiffs would be entitled to a presumption of causality. See id. at 60 (citing Vaughns by Vaughns v. Bd. of Educ. of Prince George's County, 758 F.2d 983, 990-91 (4th Cir. 1985)).

As I explain supra, I believe that remand is appropriate in the instant matter for further findings regarding classroom assignment. If the district court were to conclude on remand that students are assigned to different levels of education based on race, under Vaughns v. Vaughns such a finding would create a presumption of causal relationship between the dejure violation and the disparities in achievement, and the evidentiary burden would shift to Appellees. We note, too, that this presumption would be entirely consistent with the district court's own finding that "lower levels of instruction may not encourage achievement and may adversely affect the ability of a student to attend college." Coalition, 901 F. Supp. at 801, 49.

Because any conclusion the court draws regarding class placement may affect its conclusion that "[t]here is no credible evidence demonstrating that the differences between black and white children's success in school can be attributed to the former de jure segregated school system," id. at 823, I would vacate the court's conclusion regarding the so-called areas of concern and remand for reconsideration in light of the above.

### E. Exclusion of Jan de Leeuw's testimony

The Coalition argued on appeal that the district court improperly excluded expert testimony it sought to present to rebut the defendant' own experts, and that it was prejudiced by the exclusion. The Majority correctly notes that "[a] trial judge's exclusion of testimony cannot be disturbed on appeal 'absent a clear abuse of discretion.'" Majority at 56 (citing Semper v. Santos, 845 F.2d 1233, 1238 (3d Cir. 1988); Fashauer v. New Jersey Transit Rail Operations, 57 F.3d 1269, 1287 (3d Cir. 1995)). However, review is plenary when the district court's evidentiary ruling "implicates 'the application of a legally set standard.'" Lippay v. Christos, 996 F.2d 1490, 1496 (3d Cir. 1993) (quoting Savarese v. Agriss, 883 F.2d 1194, 1200 (3d Cir. 1989)).

#### 1. Factual findings

On November 2, 1994, the district court issued an order setting up, inter alia, the framework for pre-trial discovery. In particular, the court ordered that by November 9, 1994, "each party [should] designate which of its experts [would] testify at trial and the specific subject matter as to which each expert [would] testify." Coalition to Save our Children v. Delaware Board of Education, Nos. 1816-1822-SLR, slip op. at 4 (D. Del. Nov. 2, 1994) (Order) (JA 318). The court further ordered the

parties to "exchange expert reports, the content of which will comply with Fed. R. Civ. P. 26(a)(2)(B)" by November 23. Id., slip op. at 5 (JA 319).

The Coalition submitted its list of experts on November 17. Among those listed was Dr. Jan de Leeuw, Director of the UCLA Statistical Consulting Center. Redesignation of Expert Witnesses, Coalition to Save our Children v. State Board of Education, C.A. No. 1816-1822 SLR, slip op. at 2 (D. Del. Nov. 17, 1994) (JA 346). Dr. de Leeuw was to "be called as an expert witness in the fields of statistical consultation, data analysis, and related matters." Id.

Dr. de Leeuw submitted his Report on Creation and Use of Database (hereinafter the "de Leeuw Report") on November 29, 1994. JA 4041. The report deals exclusively with the preparation and construction of the database. One section, entitled "Goal of Analysis," explains:

> The analysis consists of providing expert
> witnesses with tables. The tables depicted
> the racial composition of districts and
> schools with regard to outcomes of interest.
> These tables provide the actual number and
> percentages of students who fall within each
> of these categories. In addition, the tables
> include marginal (or conditional)
> percentages.

De Leeuw Report at 14 (JA 4055).

An attorney for the school system wrote to the court on December 1 protesting that "the expert reports provided by Plaintiff were incomplete," Letter from Rodman Ward, Jr. to Judge Sue L. Robinson (Dec. 1, 1994) (JA 362), and asking that the Coalition provide "expert reports that comply fully with Rule 26(a)(2)(B)" by December 9. Id.; see also Letter from Rodman Ward, Jr. to Thomas D. Barr (Dec. 2, 1995) (JA 384). The Coalition apparently did not supplement Dr. de Leeuw's report by that date. Board's Brief at 55.

Dr. de Leeuw was deposed on December 15. After being initially asked if he would be "offering any opinions in this matter," he responded, "Opinions, no. I have to describe the database construction, and I don't think that involves any opinions." Deposition of Jan de Leeuw, Dec. 15, 1994 (hereinafter the "de Leeuw Deposition") (JA 1562). However, Thomas Henderson, a counsel for the Coalition, intervened later during the deposition to "give [the Board's counsel] notice that [Dr. de Leeuw] may testify as to materials and analyses, data . . . in the defendants [sic] reports." Id. (JA 1563). Describing this intervention as "a real problem," Andre G. Bouchard, the school system's counsel, requested that he be given notice if the Coalition intended to call Dr. de Leeuw to testify about "anything outside of his report." Id. Mr. Henderson responded, "Well, I heard your request and it's on the record, and I will consider that." Id.

The same day, the Coalition informed the defendants of its intention to call three new rebuttal experts. One of these witnesses was Dr. Franklin Fisher, a professor of economics at

M.I.T., who was to testify on the statistical analysis methods used in the reports by Dr. Rossell, Dr. Armor and Dr. Walberg, three of the Board's witnesses. JA 858. The defense objected during a hearing held on December 27, on the ground that Dr. Fisher's testimony would simply "duplicate what [it] thought Mr. Deleeuw [sic] was supposed to do." JA 860. The next day, the court sustained the objection and excluded the new experts' testimony:

> The deadline for naming experts is long past. The general context of defendants' experts' testimony and methodology used by these experts should have been of no surprise to the plaintiff. Defendants would be prejudiced if these experts were allowed to testify. And plaintiff has not claimed prejudice in the absence of their testimony.

Tr. 1572 (JA 863). The Coalition did not appeal the court's ruling.

On January 3, 1995, the day of Dr. de Leeuw's testimony, the Coalition's counsel handed to the defendants what defendants describe as "91 pages of charts and statistical data," Board's Brief at 56, and signaled that it intended to call Dr. de Leeuw to offer rebuttal testimony regarding the analyses of three experts for the defendants, Drs. Armor, Achilles and Reschly. Boards' Brief at 56. The new testimony sought from Dr. de Leeuw was to be the same as that which the Coalition expected to elicit from Dr. Fisher, and that the court excluded on December 28. JA 1229. This time again, however, the court excluded the testimony on the ground that the Coalition's effort failed to comply with the court's previous orders and with Rule 26.

### 2. Legal analysis

The Coalition argues that the court's exclusion of Dr. de Leeuw's rebuttal testimony is contrary to Rule 703 of the Federal Rules of Evidence, as well as "normal practice and the common usage of expert witnesses." Appellant's Brief at 47. The Coalition further argues that exclusion of Dr. de Leeuw's testimony "does not make sense since Dr. de Leeuw's testimony was fashioned, and could only have been fashioned, after the cross-examination of the School System's witnesses and the production of data bases and disk files that were made during trial." Id. at 47-48. Finally, the Coalition argues that the excluded testimony "would have demonstrated a series of methodological and analytical flaws fatally undermining [the Coalition's] testimony." Id. at 47. Because the district court failed to consider the importance of Dr. de Leeuw's proffered testimony, I would remand.

#### (a)

I note, first, that Rule 703 of the Federal Rules of Evidence is inapposite to the dispute at hand. Rule 703 states, inter alia: "The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing." The subject of the dispute over Dr. de Leeuw's testimony, and the reason for his exclusion, is the scope of his expertise as

defined in the Coalition's November 30 report, and more specifically "whether at this late stage in the proceeding the plaintiff should be given the opportunity to present affirmative evidence by an expert never before qualified in" the area of student achievement.  JA 1230 (statement by The Court).

Similarly, the cases cited by the Coalition as evidencing "normal practice and the common usage of expert witnesses" are of no relevance in the instant case.  The issue in the first two cases was whether an expert should be allowed to testify after attending the testimony of other witnesses, allegedly in violation of an order by the court excluding all witnesses from the courtroom during trial.  United States v. Crabtree, 979 F.2d 1261, 1270 (7th Cir. 1992), cert. denied, 114 S. Ct. 216 (1993); United States v. Bramlet, 820 F.2d 851, 855 (7th Cir.), cert. denied, 484 U.S. 861 (1987).  Nor does the third case cited by the Coalition, an unreported district court opinion, offer any support for its argument.  Laysears v. Schindler Elevator Corp., No. Civ. A. 94-3152 (E.D. Penn. Sept. 27, 1995).

(b)

The Coalition next argues that Dr. de Leeuw's testimony could only have been fashioned after cross-examination of the Board's witnesses and the production of databases and disk files during trial.  There are two problems with this argument.  The first is that regardless of when specific data was given to the Coalition, the Coalition was aware all along that the school system would present statistical analyses as part of its argument, and it was aware by late November of the areas for which statistical analysis would be presented.  The second problem has to do with the chronology of what information was available and when.  As just noted, as of November 30, the Coalition knew the subjects on which the school system's various experts would testify, and the extent to which they relied on statistical analysis.  JA 1289.  As to specific experts, "anything that Dr. Achilles relied on in his testimony was entirely in the appendix to the report on the 30th in terms of all the backup data for his tables."  JA 1290.  Regarding Dr. Reschly's testimony, "the backup tables for all of that data [the data on which Dr. Reschly relied] were all contained in the appendix that [the school system] delivered on November 30th."  Id.  Finally, as to Dr. Armor, it appears from the school system's uncontroverted testimony that "[h]is methodology is described in his report.  The statistical analysis is described in his report.  The assumptions that he made in his regression methodology is described carefully and fully in his report."  Id.  Therefore, the only data that was missing as of December 1 was specific census data used by Dr. Armor in his work -- but again, while the Coalition may not have had all the data as of November 30, it knew the scope and methodology of the testimony to be presented by the school system.  Therefore, the district court was certainly acting within its discretion when it found that the Coalition failed to comply with its orders regarding Dr. de Leeuw's belated testimony.

(c)

Our analysis does not end with the district court's finding, however. It has been the "consistent position" of the Third Circuit that "'the importance of the excluded testimony is one of the factors to be considered in deciding whether the trial court abused its discretion in excluding a witness.'" Sowell v. Butcher & Singer, Inc., 926 F.2d 289, 302 (3d Cir. 1991) (quoting Meyers v. Pennypack Woods Home Ownership Assn., 559 F.2d 894, 904 (3d Cir. 1977), overruled on other grounds, Goodman v. Lukens Steel, 777 F.2d 113 (3d Cir. 1985), aff'd, 482 U.S. 656 (1987)). Other factors include: "bad faith on the part of the party seeking to call witnesses not listed in his pretrial memorandum," Meyers, 559 F.2d at 904; "ability of the party to have discovered the witnesses earlier," id.; "validity of the excuse offered by the party," id.; "willfulness of the party's failure to comply with the court's order," id.; and "the parties' intent to confuse or mislead his [sic] adversary." Id.. As the court in Meyers explained, the following "basic considerations" should guide the court's decision:

> (1) the prejudice or surprise in fact of the party against whom the excluded witnesses would have testified, (2) the ability of that party to cure the prejudice, (3) the extent to which waiver of the rule against calling unlisted witnesses would disrupt the orderly and efficient trial of the case or of other cases in the court, and (4) bad faith or willfulness in failing to comply with the court's order.

Id.at 904–05; see also DeMarines v. KLM Royal Dutch Airlines, 580 F.2d 1193, 1201–02 (3d Cir. 1978).

Furthermore, "the likelihood of finding an abuse of discretion is affected by the importance of the district court's decision to the outcome of the case and the effect it will have on important rights." In re Paoli Railroad Yard PCB Litigation, 35 F.3d 717, 750 (3d Cir. 1994) (citation omitted), cert. deniedsub nom. General Electric Co. v. Ingram, 115 S. Ct. 1253 (1995).

There is no evidence in the record that the district court considered the importance of Dr. de Leeuw's proffered testimony or several of the other factors outlined in Meyers. Therefore, I believe that we should vacate the district court's decision to exclude Dr. de Leeuw's belated testimony and remand to the district court for the more complete consideration of Dr. de Leeuw's testimony that the law of this Circuit demands.

### III. Conclusion

The presence of a number of young black students at the argument of this matter should serve as a compelling reminder to us that while we struggle over the sufficiency of proof and allocation of burdens, our decision today directly affects the education and future of many of these young people.

As I cannot join the opinion of the Majority on the legal grounds outlined above, neither can I join the condemnation of Coalition's counsel. Without the zealous advocacy demonstrated throughout this case's history, much of what has

been accomplished in the past two decades would not have been.

Nor can I join in the Majority's criticism of "the micromanagement of [segregated] school systems by the federal courts." Majority at 67. The courts assumed their role in these matters not out of an unquenchable thirst for power or a desire to intrude upon the province of others, but because of the failure of those charged with the responsibility of ending segregation to fulfill the duties imposed upon them and respond voluntarily to the commands of Brown. The courts' authority in these matters does not spring from arrogance, nor does it merely "inhere in equity jurisdiction." Id. It is rooted in the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

Much time has elapsed since the State of Delaware was first ordered to desegregate its schools and, admittedly, much has been accomplished. But unless and until we can be certain that all of the vestiges of past discrimination have been eliminated to the extent practicable, supervision should not be abandoned. Considering that we are dealing here with the education and future of a large number of tomorrow's leaders, to trade additional time for greater equality is not a bad bargain.

Accordingly, I would remand for further consideration and findings consistent with this opinion.